**Gilbert J. COMBER, Appellant,**

v.

**UNITED STATES, Appellee.**

**Edward L. HAYWARD, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 87–249, 89–31.**

District of Columbia Court of Appeals.

Argued En Banc April 30, 1990.
Decided Dec. 21, 1990.

---

James Klein, Public Defender Service, with whom Allan Brenner, Gretchen Franklin, Kenneth B. Nunn, Henderson Hill, and Carol Steiker, Public Defender Service, Washington, D.C., were on the briefs, for appellants.

Roy W. McLeese III, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas J. Tourish, Jr., Thomas J. Motley, Barry Coburn, Per A. Ramfjord, Asst. U.S. Attys., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C. at the time the briefs were filed, were on the briefs, for appellee.

Before ROGERS, Chief Judge, NEWMAN, FERREN, BELSON, TERRY, STEADMAN and SCHWELB, Associate Judges.

STEADMAN, Associate Judge:

In these consolidated appeals, we are faced with the immediate question of what jury instructions for the crime of manslaughter are appropriate where a person

dies as a result of bare-fisted blows to the face. Like an unraveling string, this inquiry has led to and necessitated a more general examination of the law of manslaughter and particularly its division in our jurisdiction into "voluntary" and "involuntary" components.[1] In No. 87–249, Joseph Pinkney died after appellant Comber struck him either once or twice in the face with his bare fist. In No. 89–31, Geriel Butler died after appellant Hayward, in two incidents separated by five to twenty-five minutes, punched him twice in the face. Both men were indicted for second-degree murder in violation of D.C.Code § 22–2403 (1989) and were tried before juries. In each case, the jury acquitted the defendant of second-degree murder but returned a guilty verdict on the lesser-included charge of voluntary manslaughter. *Id.* § 22–2405. Both appellants challenge the voluntary manslaughter instructions upon which the juries based their verdicts. They also raise challenges pertaining to involuntary manslaughter instructions: appellant Hayward claims the trial court erred in refusing to give such an instruction, while appellant Comber claims the involuntary manslaughter instruction in his case was improper. Because we agree with these contentions of instructional error, we reverse and remand for new trials.

## I. THE HOMICIDES

### A. *Appellant Comber*

Gilbert Comber apparently did not approve of his sister Mary Comber's relationship with Joseph Pinkney. On February 3, 1986, Pinkney, Mary's former boyfriend, came to the Comber residence to visit her. When Ms. Comber attempted to leave the house to speak with Pinkney, appellant intervened and would not permit her to leave.

Appellant and Ms. Comber began to struggle, and appellant hit her. After Pinkney saw this, he and appellant began to argue. However, the two men were separated, and Pinkney left the area before any further violence erupted. During the afternoon of February 4, Pinkney and Mary Comber arrived at the Comber residence after having spent the day together. The two had decided to get married, and had been drinking with friends. A friend of the Combers mistakenly told appellant that Pinkney and Ms. Comber had secretly been married. Saying he was going to get his sister, appellant went out to the alley where Ms. Comber and Mr. Pinkney had parked their car. Witnesses differed as to what happened next. All agreed, however, that Comber, who was substantially smaller by weight than Pinkney, punched Pinkney either once or twice in the face. Pinkney, who was extremely intoxicated at the time of death, fell down, and appellant returned to his house. Though Pinkney was still conscious after being knocked to the ground, he later lapsed into unconsciousness; by the time police arrived, he appeared to be dead. The medical examiner who performed an autopsy on Pinkney's body testified that the cause of death was one or more extremely forceful blows to the face which caused subarachnoid brain hemorrhaging, or bleeding in the part of the brain which controls the heartbeat and respiration. According to the medical examiner, there was no evidence that Pinkney's death resulted from his head striking the pavement when he fell. Appellant Comber testified that he struck Mr. Pinkney only once, and in self-defense. He stated that Pinkney took a swing at him when he tried to get his sister to return to

---

1. After each of these appeals was argued before different panels, we *sua sponte* determined to hear the cases en banc. We requested the parties to submit supplemental briefs addressing:

 the definition, scope, and limits of the common-law crime of manslaughter, as well as the propriety of current standard jury instructions on manslaughter. Included among the court's concerns are:

 1. The distinction between voluntary and involuntary manslaughter

 2. The significance of the distinction between voluntary and involuntary manslaughter, in light of the fact that both are identically punished pursuant to a single statutory provision. D.C.Code § 22–2405 (1989).

 3. The distinction between manslaughter—both voluntary and involuntary—and second degree murder.

 4. The distinction between involuntary manslaughter and homicides for which no criminal liability attaches.

the house with him, and that he never intended to kill Pinkney.

## B. *Appellant Hayward*

In the early morning hours of November 27, 1987, appellant Hayward struck Geriel Butler in the jaw. Butler fell into the street, hit his head, and lost consciousness. He soon regained consciousness, stood up, and walked away. Witnesses disagreed about precisely what happened next, but they all agreed that appellant Hayward and Butler encountered one another again a short time later near a van from which a vendor sold clothes. Appellant Hayward again punched Butler in the jaw. As Butler fell to the ground, the back of his head struck the concrete. Butler lost consciousness and died later that morning at D.C. General Hospital. The medical examiner who performed an autopsy on Butler's body testified that the cause of death was swelling and herniation of the brain, caused by the impact to the back of Butler's head when he fell and hit the ground.

Appellant Hayward testified that he struck Butler in self-defense. He stated that Butler approached him and asked to purchase drugs. After being rebuffed, Butler hollered at appellant Hayward and approached him with his fist balled up. Thinking Butler was about to hit him, appellant Hayward struck Butler. Hayward stated that he then walked across the street to the clothes van, where a short time later Butler again approached, shaking his fist and seeking retribution for the earlier incident. Thinking that Butler would strike him, Hayward again hit Butler, who fell, hitting his head on the concrete.

## II. THE INSTRUCTIONS

### A. *Appellant Comber*

After extended discussions, the trial court in Comber's case decided to instruct

**2.** The italicized portions of the instruction reflect deviations from the standard "redbook" voluntary manslaughter instruction. *See* Criminal Jury Instructions for the District of Columbia, No. 4.25 (3d ed. 1978). The standard instruction does not include the third element that

the jury on both the lesser-included offenses of voluntary manslaughter and involuntary manslaughter. As to each offense, the judge modified the District's standard jury instructions. The court gave the following instructions on voluntary manslaughter:

Now, let me read to you the jury instructions on voluntary manslaughter.

Manslaughter is the unlawful killing of a human being without malice. Manslaughter is committed when a human being is killed unlawfully in the sudden heat of passion caused by adequate provocation as the Court has already defined those terms for you. The elements of this offense, each of which the Government must prove beyond a reasonable doubt are as follows:

One: That the defendant inflicted an injury or injuries upon the deceased from which the deceased died.

Two: That the killing was committed without legal justification or excuse.

*And three: That the defendant intended to commit the acts which inflicted the injury or injuries.*

To establish the first essential element it is necessary that the defendant have inflicted an injury or injuries upon the deceased and that the deceased died as a result of such injury or injuries.

To establish the second essential element of the offense it is necessary that you find the defendant guilty beyond a reasonable doubt, *that the defendant did not act in self-defense.*

*And to establish the third essential element it is necessary that you find that the defendant intended to commit the act which inflicted the injury or injuries upon the deceased.*[2]

(Emphasis added.)

On the crime of involuntary manslaughter, the trial court instructed the jury as follows:

the defendant intend to commit the acts which caused death. Additionally, the trial court modified the standard instruction's explanation's explanation of justifiable and excusable homicide. The standard instruction provides:

[I]nvoluntary manslaughter is the unlawful killing of a human being without malice. It may be a killing committed without a specific intent to kill or even without the specific intent to inflict injury which causes death. One may be found guilty of involuntary manslaughter if you find that his conduct was so reckless that it involved extreme danger of death or serious bodily harm and was a gross deviation from the standard of conduct a reasonable person should have observed under the circumstances.

Now, the elements of this offense, each of which the Government must prove beyond a reasonable doubt, are as follows:

One: That the defendant inflicted an injury upon the deceased from which the deceased died.

Two: That the injury was a result of a course of conduct involving extreme danger of death or serious bodily injury.

Three: That *although the conduct was not intentional* it amounted to recklessness and was a gross deviation from the standard of conduct that a reasonable person should have observed.

And four: That the killing was committed without legal justification or excuse.[3]

(Emphasis added.)

According to these instructions, the essential difference between voluntary and involuntary manslaughter lies in whether or not the defendant intentionally committed the act that caused death. In effect, the court instructed the jury that if Comber intentionally punched Pinkney in the face, the jury should find him guilty of voluntary manslaughter. On the other hand, if Comber punched Pinkney only accidentally, and the unintentional punch rose to the requisite level of recklessness, then the jury should find him guilty of involuntary manslaughter.

### B. *Appellant Hayward*

Hayward requested instructions on both voluntary and involuntary manslaughter. The trial court agreed to instruct the jury on voluntary manslaughter, and gave the jury the following charge:

Voluntary manslaughter ... is the unlawful killing of a human being without malice. The essential elements of the offense of voluntary manslaughter, each of which the Government must prove beyond a reasonable doubt are:

One, that the defendant inflicted an injury or injuries upon the deceased from which the deceased died;

[A]nd, two, that the killing was committed without legal justification or excuse.

To establish the first essential element of that offense, it is as I have told you necessary that the defendant have inflicted an injury or injuries. With regard to the second element of that offense, it is necessary that the killing or homicide have been committed without legal justification or excuse.

Justifiable homicide is the necessary killing of another person in the performance of a legal duty or where the person who kills not being himself at fault has the legal right to kill. Excusable homicide occurs where the person who kills although himself at fault had the legal

---

Justifiable homicide is the necessary killing of another in the performance of a legal duty, or where the person who kills, not being himself at fault, had a legal right to kill.

Excusable homicide occurs where the person who kills, although himself at fault, had the legal right so to kill, or where the killing was the accidental result of a lawful act done in a lawful manner. *Id.* In appellant Comber's case, the trial court's instruction limited the definition of justifiable or excusable homicide to killings in self-defense.

**3.** The italicized portion reflects an emendation to the standard "redbook" involuntary man-

slaughter instruction. *See* Criminal Jury Instructions for the District of Columbia, *supra* note 2, No. 4.26. Additionally, as in its voluntary manslaughter instruction, the trial court's involuntary manslaughter instruction informed the jury that to prove that the killing was committed without legal justification or excuse, the government had only to show "that the defendant did not act in self-defense."

The trial court also instructed the jury that it should consider the involuntary manslaughter offense only if it first concluded that the defendant was not guilty of voluntary manslaughter. *See infra* note 46.

right so to kill or where the killing was the accidental result of a lawful act done in a lawful manner.[4]

In response to the appellant's request for an involuntary manslaughter instruction, however, the trial court declared that Butler's killing "wasn't ... a result of recklessness." Accordingly, the court refused to give such an instruction.

## III. THE CRIME OF MANSLAUGHTER

### A. *Historical background*

Although D.C.Code § 22–2405 (1989) establishes the penalty for manslaughter, "there is no statutory definition of manslaughter in the District of Columbia." *United States v. Bradford,* 344 A.2d 208, 213 (D.C.1975). "[M]anslaughter is defined, rather, by reference to the common law." *Williams v. United States,* 569 A.2d 97, 98 (D.C.1989). *See also Bradford, supra,* 344 A.2d at 213.[5] Accordingly, in resolving the issues before us, a brief review of the common law emergence of the crime of manslaughter will be useful.

1. The division of criminal homicide into murder and manslaughter

"What we now know as murder and manslaughter constituted just one offense under the common law of England." R. PERKINS & R. BOYCE, CRIMINAL LAW 125 (3d ed. 1982). At the turn of the sixteenth century, all homicides, with the exception of accidental homicides, homicides committed in self-defense, or homicides committed "in the enforcement of justice," "were deemed unlawful and were punished by death."

*Mullaney v. Wilbur,* 421 U.S. 684, 692, 95 S.Ct. 1881, 1886, 44 L.Ed.2d 508 (1975). The harsh effects of this regime were mitigated, however, by the extension of ecclesiastic jurisdiction. *Id.* Ecclesiastic courts, which retained jurisdiction to try clerics accused of criminal offenses, *see Williams, supra,* 569 A.2d at 101 n. 9, did not impose capital punishment. Rather, under ecclesiastic law, a person who committed an unlawful homicide "received a one-year sentence, had his thumb branded and was required to forfeit his goods." *Mullaney v. Wilbur, supra,* 421 U.S. at 692, 95 S.Ct. at 1886. The transfer of a case from the secular to the ecclesiastic jurisdiction, a procedural device known as "benefit of clergy," thus "resulted in leniency of the most important sort." *People v. Burroughs,* 35 Cal.3d 824, 839, 201 Cal.Rptr. 319, 329, 678 P.2d 894, 904 (1984) (concurring opinion). Moreover, "[b]y the fifteenth century, the courts began to accept proof of literacy as the test for clerical status, with the result that benefit of clergy became a 'massive fiction' that 'tempered in practice the harshness of the common law rule that virtually all felonies were capital offenses.' " *Williams, supra,* 569 A.2d at 101 n. 9 (citation omitted).

Perhaps because of concern about "the accretion of ecclesiastic jurisdiction at the expense of the secular," *Mullaney v. Wilbur, supra,* 421 U.S. at 692, 95 S.Ct. at 1886, or perhaps because " 'the number of serious offenses appeared to increase,' " *Williams, supra,* 569 A.2d at 101 n. 9 (citation omitted), England's monarchs, beginning in the late fifteenth century and into the first half of the sixteenth, enacted

---

4. The trial court's voluntary manslaughter instruction is identical in all substantive respects to the standard "redbook" instruction for that offense. *See* Criminal Jury Instructions for the District of Columbia, *supra* note 2, No. 4.25.

5. As we recently explained, under D.C.Code § 49–301 (1987), this court is "bound by Maryland common law in effect as of 1801 (incorporating English common law and statutes in effect as of 1776) unless expressly repealed or modified by statute." *Williams, supra,* 569 A.2d at 99. We noted, however, that

> by incorporating the common law of Maryland, Congress did not intend to freeze the common law as it existed in 1801. Rather,

Congress meant to incorporate the "dynamic" common law, not merely "its then-current pronouncements on specific problems." As a consequence, [we have] concluded that D.C. Code § 49–301 "is not a bar to the exercise of our inherent power to alter or amend the common law."

*Id.* at 100 (citations omitted); *see also Bradford, supra,* 344 A.2d at 216 ("[c]ommon law doctrines are not frozen for criminal cases any more than civil cases, and the courts charged with voicing the common law of the District of Columbia take account of the evolution of common law principles in light of current perceptions and needs" (citation omitted)).

a series of statutes which excluded a class of the most heinous homicides from benefit of clergy. *Mullaney v. Wilbur, supra,* 421 U.S. at 692–93, 95 S.Ct. at 1886–87. These killings were referred to in the various statutes as "wilful prepense murders," "murder upon malice prepensed," and "murder of malice prepensed." 3 J. STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 44 (1883). *See also Mullaney v. Wilbur, supra,* 421 U.S. at 692–93 & 693 n. 13, 95 S.Ct. at 1886–87 & 1886 n. 13. "Unlawful homicides that were committed without such malice were designated 'manslaughter,' and their perpetrators remained eligible for benefit of clergy." *Id.* at 693, 95 S.Ct. at 1886. The offenses encompassed by the new statutes were designated "murder"; perpetrators of these offenses were subject to secular jurisdiction and capital punishment. This distinction between murder and manslaughter persisted "[e]ven after ecclesiastic jurisdiction was eliminated for all secular offenses." *Id.* These early statutory developments thus

> led to the division of criminal homicides into murder, which retained its status as a capital crime, and the lesser offense of manslaughter. The courts defined murder in terms of the evolving concept of "malice aforethought" and treated manslaughter as a residual category for all other criminal homicides.

MODEL PENAL CODE § 210.3 comment 1, at 44 (Official Draft and Revised Comments 1980) (footnotes omitted). *See also* 3 J. STEPHEN, *supra,* at 45.

Thus, manslaughter, "[i]n its classic formulation ... consisted of homicide without malice aforethought on the one hand and without justification or excuse on the other." MODEL PENAL CODE, *supra,* § 210.3 comment 1, at 44. This definition has been adopted in the District of Columbia. *See Morgan v. United States,* 363 A.2d 999, 1002 (1976) ("[m]anslaughter is the unlawful—that is, unexcused—killing of a human, without malice"). A homicide which constitutes manslaughter is distinguished from murder by the absence of malice. *United States v. Wharton,* 139 U.S.App.D.C. 293, 296, 433 F.2d 451, 454 (1970) (malice is "the sole element differentiating murder from manslaughter"), and is distinguished from a killing to which no homicide liability attaches [6] by the absence of factors which would excuse or justify the homicide. Manslaughter is thus a "catch-all" category, defined essentially by reference to what it is not. *See* R. MORELAND, THE LAW OF HOMICIDE 61 (1952); 2 W. LAFAVE & A. SCOTT, *supra* note 6, § 7.9, at 251; R. PERKINS & R. BOYCE, *supra,* at 104–05. *See also* 40 AM. JUR. 2D *Homicide* § 54 (1968) ("[i]f a homicide is neither murder in the first nor in the second degree, and yet is neither justifiable nor excusable in law, it follows, ordinarily, that it must be manslaughter").

2. The division of manslaughter into voluntary and involuntary manslaughter

■ The broad and undifferentiated early definition of manslaughter created pres-

---

6. The Model Penal Code includes a provision, less serious than manslaughter, imposing homicide liability for killings "committed negligently." MODEL PENAL CODE, *supra,* § 210.4. Many states have adopted similar "negligent homicide statutes." *See* 2 W. LAFAVE & A. SCOTT, SUBSTANTIVE CRIMINAL LAW §§ 7.12(a), 7.12(e), at 280, 287 (1986); R. PERKINS & R. BOYCE, *supra,* at 118. Accordingly, in these jurisdictions it is not true that a homicide which is neither murder nor manslaughter is necessarily justified or excused. Most of the jurisdictions which have adopted such negligent homicide provisions, however, have restricted the involuntary manslaughter liability to cases where the actor is conscious of the risk of death or serious bodily injury created by his or her conduct. 2 W. LAFAVE & A. SCOTT, *supra,* § 7.12(a), at 278. (As discussed below, in the District of Columbia, the actor need not be conscious of a criminally culpable risk for involuntary manslaughter liability to attach.) What constitutes negligent homicide in jurisdictions which have adopted such statutes most likely would have constituted involuntary manslaughter at common law. R. PERKINS & R. BOYCE, *supra,* at 117.

Although the District of Columbia Code contains no general negligent homicide statute, it does include a special "negligent homicide" provision pertaining to the operation of vehicles. This statute makes it a felony to "cause the death of another" by the "operation of any vehicle in a careless, reckless, or negligent manner." D.C.Code § 40–713 (1990). The offense is "deemed to be included within every crime of manslaughter charged to have been committed in the operation of any vehicle." D.C.Code § 40–714 (1990).

sure for refinement. In the same way that the early common law concept of unlawful homicide had evolved into murder and manslaughter, so too did manslaughter divide into separate categories of voluntary and involuntary manslaughter, depending on the type of conduct involved. 2 W. LaFave & A. Scott, *supra* note 6, § 7.9, at 251; *id.* § 7.12, at 276–77. The distinction between the two varieties of manslaughter was noted by Blackstone as early as 1769. *See* 4 W. Blackstone, Commentaries *191–93 (originally published 1769).[7] Initially, the distinction between voluntary and involuntary manslaughter was deemed "purely ... factual," in that "the punishment [was] the same for both." R. Perkins & R. Boyce, *supra*, at 83. At least until 1975, this tradition was reflected in the District of Columbia, where the punishment for manslaughter was prescribed by a single statute which made no distinction between voluntary and involuntary manslaughter, *see* D.C.Code § 22–2405, and where "it ha[d] not been the practice to charge [voluntary and involuntary manslaughter] separately and explicitly in indictments." *Bradford, supra,* 344 A.2d at 216. However, in *Bradford,* this court made explicit that voluntary and involuntary manslaughter are legally separate offenses. *Id.* Recognition of this distinction was based at least in part on the perception that voluntary manslaughters ordinarily involve more culpable behavior than involuntary manslaughters, and that voluntary manslaughter frequently warrants a more severe sentence than involuntary manslaughter. *Id.* at 211; 2 W. LaFave & A. Scott, *supra* note 6, § 7.9, at 251 ("[t]oday many American jurisdictions maintain the old distinction between

voluntary and involuntary manslaughter, usually awarding a less severe punishment for involuntary than for voluntary manslaughter"); Model Penal Code, *supra,* § 210.3 comment 1, at 46 & n. 10 ("statutes dividing manslaughter into voluntary and involuntary manslaughter typically imposed greater penalties for voluntary manslaughter"); *see, e.g.,* 18 U.S.C. § 1112(b) (1988) (voluntary manslaughter punishable by imprisonment for not more than ten years; involuntary manslaughter punishable by imprisonment for three years).[8]

■ Both voluntary and involuntary manslaughter may still be accurately defined as "homicide[s] without malice aforethought on the one hand and without justification or excuse on the other." Model Penal Code, *supra,* § 210.3 comment 1, at 44. The two offenses are distinguishable by virtue of the perpetrator's state of mind; specifically, the difference between the two offenses lies in the basis for concluding that the perpetrator acted without malice aforethought. As explained below, in all voluntary manslaughters, the perpetrator acts with a state of mind which, but for the presence of legally recognized mitigating circumstances, would constitute malice aforethought, as the phrase has been defined for purposes of second-degree murder. All involuntary manslaughters, in contrast, are killings in which the perpetrator's state of mind, without any consideration of any issues of mitigation, would not constitute malice aforethought.

B. *"Malice aforethought" for purposes of second-degree murder*

■ Because of the relationship between voluntary manslaughter and murder,

---

**7.** According to Blackstone, involuntary manslaughter resulted where one killed unintentionally in the course of a non-felonious unlawful act, *id.* at *192–93, or "where a person does an act, lawful in itself, but in an unlawful manner, and without due caution and circumspection." *Id.* at *192. Voluntary manslaughter occurred "if upon a sudden quarrel two persons fight, and one of them kills the other." *Id.* at *191.

**8.** As indicated above, the legislature had drawn no statutory distinction between voluntary and involuntary manslaughter in the District of Columbia. *See* D.C.Code § 22–2405 (1989) (imposing a maximum punishment of 15 years impris-

onment and/or a $1,000 fine for the undifferentiated crime of manslaughter). Nevertheless, even under this statutory structure, where the evidence in a case might sustain a conviction for either voluntary or involuntary manslaughter, appropriate jury instructions defining the two offenses will permit the trial court to consider the offense of which the jury has convicted the defendant for sentencing purposes. Additionally, the distinction between the form of manslaughter of which a defendant has been convicted may have significant collateral consequences.

an understanding of the scope of the offense of voluntary manslaughter requires an examination of the states of mind which would make an unlawful killing second-degree murder. At common law, an unjustified or unexcused homicide rose to the level of murder if it was committed with malice aforethought. R. PERKINS & R. BOYCE, *supra*, at 57. This definition continues in effect in the District of Columbia. D.C. Code § 22–2403.[9]

■ For purposes of second-degree murder, "malice aforethought" has evolved into "a term of art" embodying several distinct mental states. *Byrd, supra* note 9, 500 A.2d at 1385. As the commentary to the Model Penal Code explains:

> Whatever the original meaning of [the] phrase [malice aforethought], it became over time an "arbitrary symbol" used by judges to signify any of a number of mental states deemed sufficient to support liability for murder. Successive generations added new content to "mal-

ice aforethought" until it encompassed a variety of mental attitudes bearing no predictable relation to the ordinary sense of the two words.

MODEL PENAL CODE, *supra*, § 210.2 comment 1, at 14. *See also* 2 W. BURDICK, THE LAW OF CRIME § 448 at 160–61 (1946) (the phrase "malice aforethought" "is now a purely technical phrase, and is used to define the state of mind which must accompany murder"). Following the common law trend, this court has recognized that malice aforethought, in the District of Columbia, "denotes four types of murder, each accompanied by distinct mental states." *Byrd, supra* note 9, 500 A.2d at 1385.

First, a killing is malicious where the perpetrator acts with the specific intent to kill. *See id.* at 1385; *Logan v. United States*, 483 A.2d 664, 671 (D.C.1984). Second, a killing is malicious where the perpetrator has the specific intent to inflict serious bodily harm. *Byrd, supra* note 9, 500 A.2d at 1385.[10] Third, "an act may involve

---

**9.** Although first and second degree murders are defined by statute, *see* D.C.Code §§ 22–2401, –2403 (1989), those statutes embody the common law definition of murder. *See Byrd v. United States*, 500 A.2d 1376, 1385 (D.C.1985), *adopted en banc, Byrd v. United States*, 510 A.2d 1035, 1037 (D.C.1986). Although Congress drew a statutory distinction between first and second degree murder for punishment purposes, Act of March 3, 1901, ch. 854, §§ 798, 800, 31 Stat. 1189, 1321 (most recently codified at D.C.Code Title 6, §§ 21, 23 (1929)), these statutes "embodie[d] the substance of murder as it was known to the common law." *Bishop v. United States*, 71 U.S.App.D.C. 132, 135 & n. 2, 107 F.2d 297, 300 & n. 2 (1939). Congress in 1901 also authorized first-degree murder punishment for certain malicious killings involving railroads. Act of March 3, 1901, ch. 854, § 799, 31 Stat. 1189, 1321 (currently codified at D.C.Code § 22–2402 (1989)). In 1940, Congress amended the first-degree murder statute, limiting first-degree felony murder for non-purposeful homicides to killings occurring in the course of six enumerated felonies. Act of June 12, 1940, Pub.L. No. 607, 54 Stat. 347 (currently codified at D.C.Code §§ 22–2401, –2403 (1989)). With the possible exception of killings occurring in the course of non-enumerated felonies, *see infra* note 15, the legislature has not modified the common-law definition of murder for the District of Columbia.

**10.** LaFave and Scott describe how an intent to inflict serious bodily injury came to constitute malice:

> [T]he English judges came to hold that one who intended to do serious bodily injury short of death, but who actually succeeded in killing, was guilty of murder in spite of his lack of an intent to kill, in the absence of circumstances which mitigated the offense to voluntary manslaughter or which justified or excused it. This type of common-law murder became a part of the law of murder in America.

2 W. LaFave & A. Scott, *supra* note 6, § 7.3, at 197 (footnotes omitted). *See also* 2 W. BURDICK, *supra*, § 450, at 168 ("intent ... to do any serious bodily harm" constitutes express malice); MODEL PENAL CODE, *supra*, § 210.2 comment 1, at 14–15 ("[a] second species of murder involved intent to cause grievous bodily harm"); R. PERKINS & R. BOYCE, *supra*, at 59 ("[a]n intent to inflict great bodily injury is sufficient for malice aforethought if there is no justification, excuse, or mitigation").

Our cases do not provide much guidance as to what constitutes serious bodily harm in the second-degree murder context. *Cf.* Cal.Penal Code § 243(f)(5) (West 1988) (for statute prescribing punishment for battery, defining "serious bodily injury" as "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement").

such a wanton and willful disregard of an unreasonable human risk as to constitute malice aforethought even if there is not actual intent to kill or injure." R. PERKINS & R. BOYCE, *supra*, at 59.[11] In *Byrd v. United States, supra* note 9, 500 A.2d at 1385, we referred to this kind of malicious killing as "depraved heart" murder.

██ Although not all jurisdictions are in agreement on the matter, *see* 2 W. LA-FAVE & A. SCOTT, *supra* note 6, § 7.4, at 200, in the District of Columbia, such depraved heart malice exists only where the perpetrator was subjectively aware that his or her conduct created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless.[12] Under our formulation, malice "may be found 'where conduct is reckless and wanton, and a gross deviation from a reasonable standard of care, or such a nature that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm.'" *Logan, supra,* 483 A.2d at 671 (citation omitted). In such circumstances, the defendant's behavior is said to manifest a "wanton disregard of human life." *Dixon, supra* note 12, 135 U.S.App.D.C. at 406 n. 8, 419 F.2d at 293 n. 8; *see also Powell, supra* note 12, 485 A.2d at 603 (defendant's conduct "manifested a disregard for the lives and safety of others").[13]

██ Historically, a fourth kind of malice existed when a killing occurred in the course of the intentional commission of a felony. Under this "felony-murder" rule, "[m]alice, an essential element of murder, is implied from the intentional commission of the underlying felony even though the actual killing might be accidental." *Byrd, supra* note 9, 500 A.2d at 1386 (quoting *Shanahan v. United States*, 354 A.2d 524, 526 (D.C.1976)). In the District of Columbia, first-degree felony murder liability attaches where the perpetrator "kills another purposely : . . in perpetrating or in attempting to perpetrate" a felony. D.C.Code § 22–2401.[14] As to unintentional killings,

11. *See also* 2 W. LaFave & A. Scott, *supra* note 6, § 7.4, at 199–200 ("[e]xtremely negligent conduct, which creates . . . not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to . . . others—though unaccompanied by any intent to kill or do serious bodily injury—and which actually causes the death of another, may constitute murder"); MODEL PENAL CODE, *supra*, § 210.2 comment 1, at 15 (malice can arise from "extreme recklessness regarding homicidal risk").

12. The fact that a reasonable person would have been aware of the risk will not sustain a finding of malice, though it may sustain a conviction for manslaughter. *See Powell v. United States,* 485 A.2d 596, 605 (D.C.1984) (Rogers, J., dissenting). As Judge Leventhal explained in *United States v. Dixon,* 135 U.S.App.D.C. 401, 419 F.2d 288 (1969), "[t]he difference between that recklessness which displays depravity and such extreme and wanton disregard for human life as to constitute 'malice' and that recklessness that amounts only to manslaughter lies in the quality of the awareness of the risk." *Id.* at 405–06, 419 F.2d at 292–93 (Leventhal, J., concurring) (cited with approval in *Thomas v. United States,* 557 A.2d 1296, 1299 (D.C.1989)). Along similar lines, we stated in *United States v. Bradford,* 344 A.2d 208, 215 n. 22 (D.C.1975): "In terms of the actor's awareness of the risk to life, if he is aware of risk, the crime is murder and not involuntary manslaughter. If he is not aware . . . and he should have been aware, the crime is involuntary manslaughter."

13. Examples of conduct rising to the level of depraved heart malice include:

> firing a bullet into a room occupied, as the defendant knows, by several people; starting a fire at the front door of an occupied dwelling; shooting into . . . a moving automobile, necessarily occupied by human beings . . .; playing a game of "Russian roulette" with another person. . . .; selling "pure" (i.e., undiluted) heroin.

2 W. LaFave & A. Scott, *supra* note 6, § 7.4, at 202–03 (footnotes omitted). An example of "depraved heart" murder in this jurisdiction appears in *Powell v. United States, supra,* 485 A.2d 596. There, the defendant disregarded a police officer's signal to stop his car and pull over. He then led police on a harrowing high speed chase, sped through a tunnel at a speed in excess of ninety miles per hour, turned onto a congested exit ramp blocked by vehicles, and struck the rear of another vehicle, killing one of its occupants. *Id.* at 598. The defendant was convicted of second-degree murder on the theory that his conduct "showed a wanton, reckless disregard for life." *Id.* at 601.

14. At least where purposeful killings are concerned, the terms of D.C.Code § 22–2401 apply to one who kills in the course of "any offense punishable by imprisonment in the penitentiary." In 1901, the time of the original enactment of the District of Columbia murder statute, governing law provided that one who committed an offense carrying a potential punishment of im-

first-degree murder liability attaches only if the killing occurs in the course of one of six enumerated felonies.[15]

prisonment for no more than one year was to be imprisoned either in the "workhouse" or the "jail." A sentence to a period longer than one year was to be served in the "penitentiary." *See* Act of March 3, 1901, ch. 854, § 934, 31 Stat. 1189, 1341; *see also United States v. Evans,* 28 App.D.C. 264, 266, 269 (D.C.1906). This dichotomy comports with our contemporary understanding that offenses carrying potential incarceration of a year or less are misdemeanors, while those carrying potential incarceration of more than a year are felonies. *See Feeley v. District of Columbia,* 220 A.2d 325, 329 (D.C. 1966).

**15.** What remains unclear in the District of Columbia is the status of one who commits a non-purposeful killing in the course of a felony not specified in D.C.Code § 22–2401. *See Towles v. United States,* 521 A.2d 651, 660 n. 4 (1987) (en banc) (Newman, J., dissenting). We have found no case in this jurisdiction explaining what limitations on the common law felony-murder rule, if any, have been recognized in the District of Columbia since the 1940 statutory modification of the felony-murder provision. *See supra* note 9. At early common law, the felony-murder rule applied to all felonies, "without regard to the dangerous nature of the felony involved or the likelihood that death might result from the defendant's manner of committing or attempting the felony." 2 W. LaFave & A. Scott, *supra* note 6, § 7.5, at 206–07. The severity of this rule is not surprising when viewed in context; at the time of the inception of the felony-murder rule, all felonies except petit larceny were punishable, though not necessarily punished, by death. R. Perkins & R. Boyce, *supra,* at 70 & n. 78; 2 F. Pollack & F. Maitland, The History of English Law Before the Time of Edward I, at 470, 467 n. 3, 488 (2d ed. 1898 reprint 1923) (felonies were crimes punishable by loss of "life or member," but for some felonies, the perpetrator "seldom, if ever, lost life and seldom lost member"). Since the early common law era, however, "legislatures have created a wide range of statutory felonies," many of which "concern relatively minor misconduct not inherently dangerous to life," Model Penal Code, *supra,* § 210.2 comment 6, at 31; *see also* 2 W. LaFave & A. Scott, *supra* note 6, § 7.5, at 207. Because of a reluctance to impose murder liability for accidental deaths caused in the course of the commission of such non-dangerous felonies, legislatures, through statutory modifications, and courts, through doctrinal adjustments, have imposed limitations on the felony-murder rule. *Id.* at § 7.5 at 206, 208–11, 213–21; Model Penal Code, *supra,* § 210.2 comment 6, at 32–35; *see also Commonwealth v. Matchett,* 386 Mass. 492, 503 n. 12, 436 N.E.2d

## C. *Justification, excuse, and mitigation*

Even where an individual kills with one of the four states of mind described above, the killing is not malicious if it is justified, excused,[16] or committed un-

400, 408 n. 12 (1982) (describing statutory and judicial limitations on the felony-murder rule and explaining that such limitations "'reflect dissatisfaction with the harshness and injustice of the rule'" (citation omitted)).

Prior to 1940, the felony-murder doctrine applied in the District of Columbia to felonies other than those recognized at common law. *See, e.g., Lee v. United States,* 72 App.D.C. 147, 150, 112 F.2d 46, 49 (1940) (death resulting during commission of "illegal transportation of untax-paid liquor, an offense punishable by imprisonment in the penitentiary" constituted second-degree murder). In raising to first-degree murder killings done in the course of six enumerated felonies, Congress arguably sought to foreclose the imposition of murder liability predicated solely on the commission of a non-enumerated felony. Such unintentional killings would then be analyzed under the relevant manslaughter doctrine. *See, e.g., State v. Dixon,* 109 Ariz. 441, 443, 511 P.2d 623, 625 (1973) (where first-degree murder statute classifies as felony murder killings in the commission of one of five enumerated felonies, a homicide occurring in the course of a non-enumerated felony does not constitute second-degree "malice aforethought" murder). The fact that the felonies enumerated in the District of Columbia felony-murder statute correlate closely with those offenses recognized as felonies at early common law might suggest that Congress intended to limit the scope of the felony-murder doctrine by anchoring it to its common-law moorings. *Compare* D.C.Code § 22–2401 (enumerated offenses include arson, rape, mayhem, robbery, housebreaking while armed, and kidnapping) *with* Model Penal Code, *supra,* § 210.2, at 34–35 (describing common law offenses as arson, rape, mayhem, robbery, burglary, larceny, and sodomy). On the other hand, it might be argued that Congress left a residual category of second-degree felony murder, in which the malice required for murder stems from the commission of a non-enumerated felony. *See, e.g., People v. Burroughs, supra,* 35 Cal.3d at 829–30, 201 Cal. Rptr. at 322–23, 678 P.2d at 897–98 (in state where statute classifies as first-degree murder homicides occurring in the course of one of six enumerated felonies, a killing resulting from another felony "'inherently dangerous to human life'" constitutes second-degree murder (citation omitted)). Given the posture of this case, we need not resolve whether second-degree felony murder exists in this jurisdiction, nor, if it does, need we determine the precise limitations to which it is subject.

**16.** At early common law, an intentional killing was "justifiable," and thus no crime, if it was

der recognized circumstances of mitigation. Implicit in the notion of malice aforethought is "the absence of every sort of justification, excuse or mitigation." R. PERKINS & R. BOYCE, *supra*, at 75. *See also Thomas v. United States*, 557 A.2d 1296, 1299 (D.C.1989) ("[m]alice in the legal sense imports ... the absence of all elements of justification [or] excuse" (citation omitted)). The absence of justification, excuse, or mitigation is thus an essential component of malice, and in turn of second-degree murder, on which the government bears the ultimate burden of persuasion. *See Mullaney v. Wilbur, supra*, 421 U.S. at 703, 95 S.Ct. at 1892; *Logan, supra*, 483 A.2d at 672 n. 11.[17] For example, even an intentional killing, if it comports with legally accepted notions of self-defense, *see McPhaul v. United States*, 452 A.2d 371, 373 (D.C.1982), is not malicious; it is excused and accordingly no crime at all.

 Unlike circumstances of justification or excuse, legally recognized mitigating factors do not constitute a total defense to a murder charge. Such circumstances may, however, serve to "reduc[e] the degree of criminality" of a homicide otherwise committed with an intent to kill, an intent to injure, or in conscious and wanton disregard of life. *Bradford, supra*, 344 A.2d at 215. Though such mitigating circumstances most frequently arise "where the killer has been provoked or is acting in the heat of passion, with the latter including fear, resentment and terror, as well as rage and anger," *id.*, mitigation may also be found in other circumstances, such as "when excessive force is used in self-defense or in defense of another and '[a] killing [is] committed in the mistaken belief that one may be in mortal danger.'" *Logan, supra*, 483 A.2d at 671 (quoting *Bradford, supra*, 344 A.2d at 215). *See also* 2 W. LaFAVE & A. SCOTT, *supra* note 6, § 7.11, at 271–76; R. PERKINS & R. BOYCE, *supra*, at 102–03. The mitigation principle is predicated on the legal system's recognition of the "weaknesses" or "infirmity" of human nature, R. PERKINS & R. BOYCE, *supra*, at 84; *Bradford, supra*, 344 A.2d at 214 (citation omitted), as well as a belief that those who kill under "extreme mental or emotional disturbance for which there is reasonable explanation or excuse" are less "morally blameworth[y]" than those who kill in the absence of such influences. MODEL PENAL CODE, *supra*, § 210.3 comment 5, at 53, 54 (internal quotation marks omitted); *see also Mullaney v. Wilbur, supra*, 421 U.S. at 698, 95 S.Ct. at 1889 (citation omitted). Legally recognized mitigating factors serve to extenuate or "dampen[ ]," *Bradford, supra*, 344 A.2d at 215, the otherwise malicious nature of the perpetrator's mental state, and thus

"commanded or authorized by law." R. PERKINS & R. BOYCE, *supra*, at 1124. Examples of justifiable homicides included "the killing of an enemy on the field of battle as an act of war within the rules of war," "the execution of a sentence of death pronounced by a competent tribunal," *id.*, or "the 'slaying of an outlaw ... who resists capture.'" Perkins, *A Re–Examination of Malice Aforethought*, 43 YALE L.J. 537, 539–40 (1934) (citation omitted) [hereinafter *"Malice Aforethought"*]. Excusable homicide was a more amorphous category, encompassing killings which, for various reasons, were deemed not to warrant criminal punishment. Examples included killings in self-defense, accidental and non-negligent killings, and "killings by a madman." R. PERKINS & R. BOYCE, *supra*, at 1124. Although "excuse" was originally only a basis for royal pardon, and not an acquittal, evidence of circumstances of excuse "disproved the charge itself" by the sixteenth century. Perkins, *Malice Aforethought, supra*, at 540. Perkins argues that to the extent "the distinction between justifiable and excusable homicide is to be retained in modern law," one who kills in self-defense "should be said to have committed justifiable homicide ... because what is authorized by law is in every proper sense, justified." *Id.* at 541 n. 39.

17. However, the government's obligation to disprove justification, excuse, or mitigation arises only when there is some evidence of one or more of these circumstances in the case. *Logan, supra*, 483 A.2d at 672 n. 11 (citing *United States v. Alexander*, 152 U.S.App.D.C. 371, 391–92 & n. 53, 471 F.2d 923, 943–44 & n. 53, *cert. denied*, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972)); *see also Davis v. United States*, 510 A.2d 1051, 1053 (D.C.1986) (once evidence of self-defense appears, government must disprove self-defense beyond a reasonable doubt). Accordingly, a jury need not be instructed on the issues of justification, excuse, or mitigation unless either the government or defense case has generated some evidence of one of those factors.

serve as a bar to a conviction for murder.[18]

### D. *Voluntary manslaughter*

In this jurisdiction, a homicide constitutes voluntary manslaughter where the perpetrator kills with a state of mind which, but for the presence of legally recognized mitigating circumstances, would render the killing murder. *See Bradford, supra,* 344 A.2d at 215 ("[k]illings classified as voluntary manslaughter would in fact be second degree murder but for the existence of circumstances that in some way mitigate malice"); *Logan, supra,* 483 A.2d at 672 (defendant is guilty of voluntary manslaughter where "the purpose to kill ... is dampened so as to mitigate malice" (internal quotation marks, citation omitted)); *cf. West v. United States,* 499 A.2d 860, 864 (D.C.1985) (defendant is entitled to voluntary manslaughter instruction as a lesser-included offense of second-degree murder only where there is evidence of mitigating circumstances); *Morgan, supra,* 363 A.2d at 1002 (same).[19] This definition of voluntary manslaughter reflects the traditional common law view and the prevailing national norm, as indicated by the formulations in numerous criminal law treatises. *See, e.g.,* W. Clark & W. Marshall, A Treatise on the Law of Crimes § 258, at 339 (5th ed. 1952) ("[i]n all cases of voluntary manslaughter there is an *actual intention to kill,* or there is *an intention to inflict great bodily harm,* from which such an intent may be implied" (emphasis added)); J. Dressler, Understanding Criminal Law 450 (1987) ("an *intentional killing* committed in 'sudden heat of passion' as the result of adequate provocation constitutes voluntary manslaughter" (emphasis added)); *id.* at 473–74 (a defendant is guilty of "voluntary manslaughter rather than murder if she *intentionally killed* [the victim]" in the heat of

18. In light of the evolution of the crime of murder, commentators have criticized the use of the phrase "malice aforethought" to describe the mental state required for the offense. *See* W. Burdick, *supra,* § 448, at 161 ("[t]he literal and ordinary meanings of the words [malice aforethought] no longer help, but rather mislead"); R. Perkins & R. Boyce, *supra,* at 57 ("[t]he phrase 'malice aforethought' is peculiarly confusing to the layman because each word has a different significance in legal usage than in ordinary conversation"). Moreover, the standard "redbook" instruction on malice, Criminal Jury Instructions for the District of Columbia, *supra* note 2, No. 4.23 ("Murder in the Second Degree"); *id.* No. 4.21 ("Murder in the First Degree —Premeditated"), particularly its use of the terms "express" and "implied" malice, has been characterized as imprecise and potentially confusing. *Powell, supra* note 12, 485 A.2d at 603 & n. 8 (Rogers, J., dissenting). Although we are not confronted in this case with a challenge to the instructions for second-degree murder, we believe that a specific description of the mental states which suffice to establish malice, rather than the use of the general term "malice" and its definition as set forth in the current "redbook" standard murder instructions, would provide clearer guidance to jurors. In cases in which there has been some evidence as to either justification, excuse, or mitigation, the jury could be instructed that the absence of justification, excuse, or mitigation, as defined by the trial court, is an element of the offense the government must prove beyond a reasonable doubt.

19. Neither the presence of mitigating circumstances, nor malice, to the extent that phrase encompasses the absence of all elements of justification, excuse, or mitigation, is an element of voluntary manslaughter which the government must prove beyond a reasonable doubt. *See United States v. Alexander,* 152 U.S.App.D.C. 371, 390, 391, 471 F.2d 923, 942, 943, *cert. denied,* 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972). Rather, the elements of the offense are that the defendant caused the death of the deceased; that at the time the defendant did so, he or she intended to kill or seriously injure the victim or acted in conscious disregard of an extreme risk of death or serious bodily injury; and, at least where there is evidence sufficient to support instruction on such an element, that the killing was without justification or excuse. Because the mental states described in the second element preclude conviction for voluntary manslaughter on the basis of an accidental, negligent, or otherwise excused unintentional killings, the only form of excuse likely to arise is self-defense. Thus, unless there is evidence of justification, self-defense, or some other rare form of excuse, the trial court need not separately instruct the jury on the element that the killing must be without justification or excuse. Where there is evidence of self-defense, the trial court can explain that the absence of justification or excuse means that the government must prove beyond a reasonable doubt that the killing was not in self-defense and then define that concept for the jury.

The presence of mitigating circumstances, though a defense to a second-degree murder charge, is not a defense to a charge of voluntary manslaughter.

passion caused by adequate provocation (emphasis added)); 2 W. LaFave & A. Scott, *supra* note 6, § 7.10, at 252 ("[v]oluntary manslaughter in most jurisdictions consists of an *intentional* homicide committed under extenuating circumstances which mitigate, though they do not justify or excuse, the killing" (emphasis added)); R. Perkins & R. Boyce, *supra*, at 83 (voluntary manslaughter covers "any killing with a person-endangering-state-of-mind that is neither murder nor innocent homicide") (footnote omitted); [20] *id.* at 104; 2 C. Torcia, Wharton's Criminal Law § 153, at 236–37 (14th ed. 1979) ("[v]oluntary manslaughter is an *intentional killing* in the heat of passion as the result of severe provocation.... [A] killing, which would otherwise constitute murder, is mitigated to voluntary manslaughter" (emphasis added, footnotes omitted)); *id.* at 238 (for voluntary manslaughter liability to attach, the "defendant may act with the *intent to kill or with any mental state which amounts to 'malice'*; the malice is negated by the provocation and the offense is mitigated from murder to voluntary manslaughter" (emphasis added)).[21]

■■■■■ The government agrees that homicides in which the perpetrator acts with a state of mind which, absent recognized mitigating circumstances, would render the killing murder constitute voluntary manslaughter. However, the government contends that voluntary manslaughter also encompasses another distinct category of killings, namely, homicides resulting when a defendant acts with the intent to cause any injury to or apply any force against the victim. Since a killing occurring under mitigating circumstances would rise to the level of voluntary manslaughter if the perpetrator acted with specific intent to cause serious bodily injury, the only killings included in the government's proposed definition not already encompassed by the above-discussed definition are those resulting from an act committed with intent to cause non-serious injury but which result in death. For several reasons, we must disagree with the government's assertion.

20. Perkins and Boyce make clear elsewhere that they use the phrase "person-endangering-state-of-mind" to describe either intent to kill, intent to inflict great bodily injury, intent to do an act in wanton and wilful disregard of an unreasonable human risk, or an intent to perpetrate a dangerous felony. *Id.* at 73. In short, Perkins and Boyce use the phrase as a shorthand way of describing the states of mind which, in the absence of justification, excuse, or mitigation, would constitute malice aforethought.

21. A number of the formulations quoted suggest that voluntary manslaughter is limited to cases in which the defendant acts with the specific intent to kill the victim. Strictly speaking, this is too narrow a definition. Although one who intends to kill certainly acts with a state of mind that, absent mitigating factors, would constitute malice, it is not the only malicious state of mind. As explained above, one who specifically intends to inflict serious bodily injury or who acts in conscious disregard of an extreme risk of death or serious bodily injury also acts with malice, absent circumstances of justification, excuse, or mitigation. Thus, notwithstanding the absence of a specific intent to kill, one who acts with specific intent to inflict serious bodily injury or in conscious disregard of an extreme risk of death or serious bodily injury may also be guilty of voluntary manslaughter, provided the killing occurs under recognized circumstances of mitigation and is therefore not murder. *See*

2 W. LaFave & A. Scott, *supra* note 6, § 7.10, at 252–53 (in addition to "intent-to-kill" homicides committed under mitigating circumstances, "killings which constitute voluntary manslaughter ... might be of the intent-to-do-serious-bodily-injury, or of the depraved heart, types").

The statement in the *Bradford* opinion that "the requisite intent [for voluntary manslaughter is] the general intent to do the act which caused death rather than a specific intent to cause death," *Bradford, supra,* 344 A.2d at 214, seems intended to describe these mental states other than a specific intent to kill which may constitute malice. In the sentences immediately following that statement, the court made clear that the requisite intent for voluntary manslaughter "approximates [the] express malice" required for second-degree murder. The court also referred to an intent "to use such force against the decedent as would endanger him," which seems to encompass both intent to inflict serious bodily injury and conscious disregard of extreme risk of death or serious bodily injury. To the extent language in the *Bradford* opinion is ambiguous, we emphasize that a voluntary manslaughter conviction may not be predicated upon a mental state other than one which would, in the absence of mitigating circumstances, render a killing murder. Because of the confusion generated in this context by the term "general intent," trial judges should avoid its use in voluntary manslaughter jury instructions.

Firstly, it would result in the adoption of an expanded definition of voluntary manslaughter at odds with the generally recognized common law understanding of that offense, as described above. Secondly, the government grounds its assertion in authority which does not markedly support its position. Thirdly, acceptance of the government's position would collide with the apparently universal classification, in jurisdictions which divide manslaughter into its voluntary and involuntary forms, of killings following a simple assault as involuntary, rather than voluntary, manslaughter. Finally, the government's position would brand a defendant as a "voluntary" killer where he acted with a mind free of any intent to kill or seriously wound and free of a degree of knowing recklessness making highly likely such a result. We think that both common law and authority make a death-oriented mental state the determinative dividing line between the two forms of manslaughter, which should reflect their differing connotations of culpability.

In support of its position that a killing is voluntary manslaughter whenever a death results from an act committed with the intent to apply any force against or inflict non-serious injury on the victim, the government invokes our opinion in *United States v. Bradford, supra,* 344 A.2d 208. In dealing with the specific problem we are presented with in these appeals—the application of some force against a decedent—the *Bradford* opinion is imprecise. Both parties invoke different parts of *Bradford* in support of their position, each rightfully finding language in the opinion which can be read to support their arguments.[22] A major purpose of our going en banc in these cases is to resolve the ambiguity in the *Bradford* opinion. We think that against the background of the common-law development of murder and manslaughter as set forth above, the language of the *Bradford* opinion invoked by the government must be read in context[23] and limited

---

**22.** Several statements in *Bradford* might be construed to support the view that voluntary manslaughter occurs whenever death results from the application of any force against the victim. At one point, the opinion indicates that one acts with the requisite mental state for manslaughter where, "even though the accused did not intend to kill, he did intend to use such force against the decedent as would endanger him." *Id.* at 214. *See also id.* at 216 n. 24 ("voluntary manslaughter involves an intent to endanger or apply force"). *But see supra* note 21 (suggesting that the concept of intent to endanger encompasses intent to inflict serious bodily injury and conscious disregard of an extreme risk of death or serious bodily injury). Elsewhere, in a footnote summarizing the discussion of voluntary and involuntary manslaughter in a 1907 edition of Wharton's treatise on homicide, the *Bradford* opinion states: "Voluntary manslaughter at common law includes all felonious homicides which result directly from any unlawful force aimed at or applied to the party slain...." *Id.* at 214 n. 14. *But see infra* p. 45–46 (discussing why Wharton's treatise does not support the view that death resulting from an assault committed without a malicious mental state is voluntary manslaughter). The opinion also suggests at one point that the requisite intent for voluntary manslaughter is "the general intent to do the act which caused death." *Id.* at 214. *But see supra* note 21 (clarifying *Bradford* and indicating that voluntary manslaughter is not a general intent crime).

Other language in *Bradford* seemingly supports a corollary of the position advanced by the government, namely, that a death resulting from the application of any force against the victim cannot constitute involuntary manslaughter. *See id.* at 215 ("Involuntary manslaughter is an unlawful killing which is unintentionally committed. By unintentionally it is meant that there is not intent to kill or to do bodily injury"). Similarly, in describing the criminal negligence variety of involuntary manslaughter, *see infra,* the court stated, "[t]he state of mind in involuntary manslaughter is characterized ... by a lack of intent to cause death or injury." Additionally, in summarizing language from Wharton's 1907 homicide treatise, the court noted that "involuntary manslaughter at common law includes homicides which were the accidental result of some unlawful act less than a felony, not aimed at or directed against the person slain." *Id.* at 214 n. 14.

As we explain in the accompanying text, however, we believe that the court in *Bradford* adopted a definition of voluntary manslaughter as a killing committed with a state of mind which would constitute malice but for the presence of mitigating circumstances. To the extent there is any ambiguity in *Bradford,* it is to be resolved in conformity with our decision today.

**23.** It must be remembered that in *Bradford,* the court was not faced with any specific fact situation, but rather was resolving the issue whether voluntary and involuntary manslaughter must be charged as separate counts in an indictment. *Bradford, supra,* 344 A.2d at 210. "It is well to remember that significance is given to broad

in its application more narrowly than the government would do.

We read *Bradford* as limiting the scope of voluntary manslaughter to killings where the perpetrator acts with a state of mind which, but for the presence of recognized mitigating factors, would render the killing malicious, and hence murder. The court expressly declared that "[k]illings classified as voluntary manslaughter *would in fact be second degree murder* but for the existence of circumstances that in some way mitigate malice." *Id.* at 215 (emphasis added). Moreover, in the paragraph summarizing its discussion of voluntary manslaughter in *Bradford,* the court stated that voluntary manslaughter "could more accurately be said to be (1) an unlawful killing of a human being (2) with malice which has been mitigated by the presence of circumstances judicially recognized as reducing the degree of criminality." *Id.*[24] Because a homicide resulting from an act committed with the intent to inflict only non-serious bodily injury would not be a killing with malice and would not constitute second-degree murder, such a killing could not constitute voluntary manslaughter as that offense was ultimately defined in *Bradford.*[25]

Nor does authority from other jurisdictions cited by the government suggest a different conclusion. The government relies in part on the Alabama Supreme Court's 1860 decision in *McManus v. State,* 36 Ala. 285 (1860). Although the court there did write that "[v]oluntary man-

slaughter included all felonious homicides, less heinous than murder, which resulted directly from any unlawful force, aimed at, and applied to the party slain," 36 Ala. 285, 288 (1860), there was evidence in the case both that the defendant struck the fatal blow with malice and that he struck the blow in the heat of passion. *Id.* at 286. Moreover, in *Harrington v. State,* 83 Ala. 9, 16, 3 So. 425, 429 (1888), the Alabama Supreme Court expressly "modified" the *McManus* decision, suggesting that the language on which the government relies here, though perhaps "sufficient" in light of the evidence in *McManus,* is inappropriate "for general use and application." *Id.* at 13–14, 3 So. at 427. The *Harrington* court made clear that "[t]he law does not pronounce the manslaughter to be voluntary merely because death ensues from the intentional application of mere unlawful force, such as a mere blow with the fist." *Id.* at 15–16, 3 So. at 428. However, a killing resulting from an "[i]ntention to do great bodily harm is sufficient" for voluntary manslaughter. *Id.* at 16, 3 So. at 428.

The government also seeks support from Wharton's 1907 treatise on homicide. F. WHARTON, THE LAW OF HOMICIDE (F. Bowlby 3d ed. 1907), *cited in Bradford, supra,* 344 A.2d at 214 nn. 14 & 16. Although some general language there suggests that "unlawful force intentionally directed against [the victim] is sufficient to render the consummated act voluntary [manslaughter]," *id.* § 5, at 7, the authority for that proposition is the Alabama *McManus* decision as limited by *Harrington. Id.* at 7 nn. 5 & 6.

and general statements of law only by comparing the facts from which they arise with those facts to which they supposedly apply." *Kraft v. Kraft,* 155 A.2d 910, 913 (D.C.Mun.App.1959).

24. *See also id.* at 214 (voluntary manslaughter is a killing "'committed with a *design to kill,* under the influence of a sudden and violent passion caused by great provocation'" (citation omitted, emphasis added)); *id.* ("the requisite intent in voluntary manslaughter approximates express malice").

25. The government also cites *Ruffin v. United States,* 524 A.2d 685 (D.C.1987), in support of its contention that voluntary manslaughter is any killing in which there is an intent to apply any force or inflict even non-serious injury. There the court, in a single paragraph of discussion in

a 22–page opinion, equated voluntary manslaughter with a killing committed "with an intent to apply dangerous force or do bodily injury." *Id.* at 705. In *Ruffin,* the appellant, a martial arts expert, struck the decedent with sufficient force to knock him down, and then repeatedly stomped the decedent in the face with a booted foot. *Id.* at 703–04. In light of these facts, as well as the juxtaposition of the degree of force the appellant had used with that involved in an *involuntary* manslaughter stemming from a "simple assault," *id.* at 705, we do not think *Ruffin* is fundamentally inconsistent with the view that a killing in which the perpetrator intended to inflict serious bodily injury constitutes voluntary manslaughter if mitigating circumstances are present.

As such, we view Wharton's treatise as indicating that voluntary manslaughter may occur where one acts with a state of mind other than an intent to kill adequate to establish malice, such as intent to inflict serious bodily injury or conscious disregard of extreme risk to life. *See supra* note 21; *cf.* F. WHARTON, *supra*, § 166, at 265 (voluntary manslaughter may arise from the commission of an act "likely to endanger life").[26]

Finally, the government's contention that a homicide in which there is any intent to injure or apply force against the victim should be deemed voluntary manslaughter collides with the apparently near-universal classification, in jurisdictions which divide manslaughter into its voluntary and involuntary forms, of killings following a simple assault as involuntary, rather than voluntary, manslaughter. This division is made clear in the *Bradford* opinion itself. Despite the fact that in both instances there is an intent to injure or apply force to the victim, the *Bradford* opinion listed death "following an assault [or] excessive correction of children by parents or teachers" as illustrations of *involuntary* manslaughters. F. WHARTON, *supra* at 215, at 339. Were the government's interpretation correct, the *Bradford* court would have included killings resulting from an assault or excessive correction of children as examples of voluntary manslaughter. Similarly, Wharton's treatise, upon which the government relies, also classifies killings resulting from assaults, in which there was clearly intent to inflict some, but not serious, bodily injury, as *involuntary* manslaughters. *Id.* § 215, at 339 ("[o]ne committing a mi-

nor assault upon another, not intending to kill, but accidentally doing so, is guilty of involuntary manslaughter"); *id.* at 340–41 ("a killing resulting from an assault by one person upon another is a killing in the commission of an unlawful act [and thus involuntary manslaughter], where, if the blow had not proved mortal, the assailant would have been subject to prosecution for assault and battery"). The treatment in *Bradford* and Wharton's treatise of a killing resulting from an assault or battery, such as a bare-fisted blow, not involving intent to kill or inflict serious bodily injury is not surprising; it reflects the traditional and uniform common law rule classifying such killings as involuntary, rather than voluntary, manslaughter. *See* 2 W. LA- FAVE & A. SCOTT, *supra* note 6, § 7.13, at 296 ("it is almost universally held ... that one is guilty of *involuntary* manslaughter who intentionally inflicts bodily harm upon another person," thereby causing an unintended and unforeseeable death (emphasis added)); MODEL PENAL CODE, *supra*, § 210.3, comment 8, at 78 & n. 95 and cases cited ("[i]t was an important feature of prevailing law at the time the Model Penal Code was drafted that one who caused the death of another by a simple battery was generally guilty of manslaughter or *of involuntary manslaughter where that was a separate category* " (emphasis added)); *see also* 2 W. BURDICK, *supra*, § 465a, at 203 (including instances of death caused by a blow by the fist or by a kick as illustrations of involuntary manslaughter). Indeed, in every reported case we have found from a jurisdiction which divides man-

---

**26.** The government also relies on *Norton v. State,* 98 Ind. 347 (1884). That case did not involve a distinction between voluntary and involuntary manslaughter, but rather a distinction between manslaughter and a situation of no homicide liability. *Id.* at 349. In any event, *Norton* cited *Bruner v. State,* 58 Ind. 159 (1877), as authority for the distinction between voluntary and involuntary manslaughter. 98 Ind. at 349. In *Bruner,* death resulted after the defendant, intending only to knock the victim to the ground, struck him in the head with a wooden stake. 58 Ind. at 162. The trial court, taking the view advanced by the government in this case, instructed the jury that if "the prisoner intended the blow, and the blow produced

death, and it was an unlawful blow, then the defendant is guilty of manslaughter voluntarily." *Id.* at 165. On appeal, the Indiana Supreme Court rejected this instruction as erroneous. *Id.* The court explained that in voluntary manslaughter "the unlawful killing is voluntary, that is, the killing is done by design or intention, or purposely; but, in [involuntary manslaughter] the unlawful killing is involuntary, that is, without any design, intention, or purpose of killing, but in the commission of some unlawful act," *id.* at 164, and noted that the defendant, "if guilty at all, was guilty rather of what we have termed involuntary manslaughter than of the crime of voluntary manslaughter...." *Id.*

slaughter into its voluntary and involuntary forms discussing killings resulting from the delivery of a single or a few blows, not administered with intent to kill or inflict serious bodily injury, such killings are classified as involuntary, rather than voluntary manslaughter. *See, e.g., People v. Morgan,* 275 Cal.App.2d 603, 607–09, 79 Cal.Rptr. 911, 913–14 (1969) (affirming involuntary manslaughter conviction where defendant struck several blows against and committed an assault and battery against victim); *People v. McManis,* 122 Cal. App.2d 891, 895–98, 266 P.2d 134, 136, 138 (1969) (affirming involuntary manslaughter conviction where defendant struck deceased in the jaw, knocking him to ground, and codefendant kicked deceased in the face); *Wyrick v. State,* 96 Ga.App. 847, 847, 102 S.E.2d 53, 54 (1958) (describing a death resulting from an assaultive blow "not likely [to] have produced death" as involuntary manslaughter); *People v. Woods,* 80 Ill.App.3d 56, 61–62, 35 Ill.Dec. 136, 139–41, 398 N.E.2d 1086, 1089–91 (1979) (where defendant struck decedent four times in the head, ensuing death constituted involuntary manslaughter), *aff'd,* 81 Ill.2d 537, 43 Ill.Dec. 733, 410 N.E.2d 866 (1980); *People v. Parr,* 35 Ill.App.3d 539, 542, 341 N.E.2d 439, 442 (1976) (assailant who caused death by striking assailant with fist found guilty of involuntary manslaughter); *Compton v. State,* 250 Ind. 103, 110, 235 N.E.2d 181, 185 (1968) ("where one unlawfully strikes another, thus committing an unlawful assault and battery, from which death ensues, one is guilty of involuntary manslaughter"); *Commonwealth v. Sheppard,* 404 Mass. 774, 776–77, 537 N.E.2d 583, 584 (1989) (where defendant killed victim by sce, the killing was involuntary manslaughter); *People v. Myers,* 30 Mich.App. 409, 426, 186 N.W.2d 381, 390 (1971) (manslaughter by assault constitutes involuntary manslaughter); *see also Harrington, supra,* 83 Ala. at 14, 16, 3 So. at 427, 429 (reversing conviction for voluntary manslaughter where defendant caused death by intentionally directed blow against the decedent); *State v. Barker,* 128 W.Va. 744, 38 S.E.2d 346, 351 (1946) (reversing voluntary manslaughter conviction where defendant struck victim once, knocking her to the ground and causing death; while such a killing could be involuntary manslaughter, "a verdict of voluntary manslaughter will not lie"). Adoption of the government's position would apparently render our jurisdiction unique in American jurisprudence.

We must conclude, in conformity with the overwhelming weight of authority on the matter, that voluntary manslaughter involves only those homicides where the perpetrator's state of mind would constitute malice aforethought and the homicide murder, but for the presence of legally recognized mitigating circumstances. If the perpetrator's state of mind is not one which would constitute malice, the fact that he or she intends to inflict non-serious injury or otherwise direct force against the victim does not render a killing voluntary manslaughter. Thus, to the extent that a death resulting from conduct accompanied by an intent to cause something less than serious bodily injury rises to the level of an unlawful homicide, it is governed by the involuntary manslaughter doctrines to which we now turn.

E. *Involuntary manslaughter*

As described in the preceding subsection, voluntary manslaughter is a killing committed with an intent to kill or do serious bodily injury, or with a conscious disregard of an extreme risk of death or serious bodily injury, where the presence of mitigating factors precludes a determination that the killing was malicious. The absence of malice under these circumstances thus reduces the offense to one form of manslaughter. In contrast, where a killing is not committed with a specific intent to kill or do serious bodily injury, or in conscious disregard of an extreme risk of death or serious bodily injury, there is no question that the killing was without malice.[27] However, even such an unintentional or accidental killing is unlawful, and thus constitutes involuntary man-

---

**27.** We may ignore for purposes of this assertion the felony-murder rule.

slaughter, unless it is justifiable or excusable. Indeed, it is the absence of circumstances of justification or excuse which renders a non-malicious killing "unlawful." Accordingly, one key to distinguishing those unintentional killings which are unlawful, and hence manslaughter, from those to which no homicide liability attaches [28] is determining the circumstances under which a killing will be legally excused.

Generally, at common law, where a person kills another in doing a "lawful act in a lawful manner," the homicide is excusable. W. CLARK & W. MARSHALL, supra, § 275, at 371. As this phrase implies, two categories of unintentional killings were not excused and thus were manslaughter: killings in the course of lawful acts carried out in an unlawful, i.e., criminally negligent,[29] fashion, and killings in the course of unlawful, i.e., criminal, acts.[30]

### 1. Criminal-negligence involuntary manslaughter

The law pertaining to the first category, which may be labelled "criminal-negligence" manslaughter, see supra note 29, has undergone considerable transformation, and the cases have steadily narrowed the range of conduct deemed sufficiently culpable to sustain a manslaughter conviction. In the thirteenth century, it appears that even a person who caused death "by misadventure," or in a completely non-negligent fashion, had no legal defense to a homicide charge. See Perkins, *Malice Aforethought, supra* note 16, at 539 n. 23, 540. By the mid-eighteenth century, however, if a death-producing act "was done with due caution, or was accompanied only by slight negligence," the perpetrator lacked the "culpable negligence" required to render the homicide manslaughter. 3 J. STEPHEN, *supra,* at 76 (summarizing the views of a treatise published in 1762). *Cf.* 4 W. BLACKSTONE, *supra,* at *192 (involuntary manslaughter occurs "where a person does an act, lawful in itself, but in an unlawful manner and without due caution and circumspection").

Under current law in the District of Columbia, one who unintentionally causes the death of another as the result of non-criminal conduct is guilty of involuntary manslaughter only where that conduct both creates "extreme danger to life or of serious bodily injury," and amounts to "a gross deviation from a reasonable standard of care." *Faunteroy v. United States,* 413 A.2d 1294, 1298–99 (D.C.1980). Thus, provided it does not fall within the scope of the misdemeanor-manslaughter doctrine, conduct resulting in death is excused unless it creates an extreme risk of death or serious bodily injury.[31] Indeed, in our jurispru-

---

**28.** At common law, a killing which was not "unlawful" so as to constitute manslaughter resulted in no criminal liability. *But see supra* note 6.

**29.** As used here, "criminally negligent" is a generic term used to describe the appropriate degree of negligence required to render a killing involuntary manslaughter. As discussed below, the law has evolved to demand increasingly heightened levels of negligence for an involuntary manslaughter conviction. Additionally, jurisdictions today differ on the degree of negligence required to render an unintentional or accidental killing involuntary manslaughter.

**30.** This dichotomy derives from the common law at the time of Blackstone, who indicated that involuntary manslaughter resulted where one killed unintentionally in the course of a non-felonious unlawful act, 4 W. BLACKSTONE, *supra,* at *192–93, or "where a person does an act, lawful in itself, but in an unlawful manner, and without due caution and circumspection." *Id.*

at *192. In *Bradford, supra,* 344 A.2d at 215, this court identified a third possible category of involuntary manslaughter, namely, a killing resulting from "the omission to perform a legal duty." We have no occasion in this opinion to resolve whether this category differs at all from the "criminal-negligence" variety of involuntary manslaughter.

**31.** By describing the standard of risk creation required to render a killing involuntary manslaughter, the standard "redbook" jury instruction implicitly incorporates the absence of excuse element of involuntary manslaughter, except in cases of self-defense. *See* Criminal Jury Instructions for the District of Columbia, *supra* note 2, No. 4.26. Accordingly, absent evidence of justification or rare forms of excuse which seldom arise, the trial court need only charge the jury separately as to the requirement that the killing be without justification or excuse when there is evidence of self-defense. In such cases, the trial court can explain that the ab-

dence the only difference between risk-creating activity sufficient to sustain a "depraved heart" murder conviction and an involuntary reckless manslaughter conviction "lies in the quality of [the actor's] awareness of the risk." *Dixon, supra* note 12, 135 U.S.App.D.C. at 406, 419 F.2d at 293 (Leventhal, J., concurring); *see also Bradford, supra,* 344 A.2d at 215 n. 22 ("if [the actor] is aware of the risk, the crime is murder and not involuntary manslaughter. If he is not aware ... and he should have been aware, the crime is involuntary manslaughter"). The gravity of the risk of death or serious bodily injury required in each case is the same.[32]

2. Misdemeanor involuntary manslaughter

■ The second category of unexcused unintentional homicides are those occurring in the course of certain unlawful acts. Centuries ago, the "unlawful act" category of involuntary manslaughter included all killings occurring in the course of a criminal act not amounting to a felony, *i.e.,* a misdemeanor. *See* 3 J. STEPHEN, *supra,* at 75 (quoting, and criticizing, the doctrine

recorded in a 1762 treatise); *see also* 4 W. BLACKSTONE, *supra,* at *192–93. The doctrine became known as the "misdemeanor-manslaughter rule," something of an analogue to the felony-murder rule. 2 C. TORCIA, *supra,* § 167, at 266; MODEL PENAL CODE, *supra,* § 210.3 comment 1, at 44–45.[33] As time passed, however, the misdemeanor-manslaughter rule "came to be considered too harsh," and "the courts began to place limitations upon it." 2 W. LAFAVE & A. SCOTT, *supra* note 6, § 7.13, at 287. Thus, in many jurisdictions, a homicide occurring in the course of a misdemeanor is involuntary manslaughter only if the offense is *malum in se,* rather than *malum prohibitum.*[34] 2 W. LAFAVE & A. SCOTT, *supra* note 6, § 7.13(c), at 287; R. PERKINS & R. BOYCE, *supra,* at 109; 2 C. TORCIA, *supra,* § 167, at 266–67. Where the misdemeanor manslaughter doctrine applies, involuntary manslaughter liability attaches even where the defendant does not act with the degree of recklessness ordinarily required for involuntary manslaughter predicated on criminally negligent behavior. In effect, the defendant's intentional commission of a misdemeanor supplies the culpability required to impose homicide liability.

sence of justification or excuse means that the government must prove beyond a reasonable doubt that the killing was not in self-defense and then define that concept for the jury.

**32.** In this regard, the law in the District of Columbia differs from the prevailing approach to "criminal-negligence" manslaughter. Most jurisdictions appear to permit the imposition of involuntary manslaughter liability on death-producing conduct involving something less than an "extreme" risk of death or serious bodily; a "high degree of risk of death or serious bodily injury" will suffice. 2 W. LAFAVE & A. SCOTT, *supra* note 6, § 7.12, at 278. *See, e.g., Commonwealth v. Catalina,* 407 Mass. 779, 783, 556 N.E.2d 973, 976 (1990) (involuntary manslaughter is homicide "unintentionally caused ... by an act which constitutes such disregard of *probable harmful consequences to another* as to constitute wanton or reckless conduct" (emphasis added)). Moreover, the "modern view, evidenced by the position taken in most of the recent comprehensive criminal codes, is to require for involuntary manslaughter a consciousness of risk." 2 W. LAFAVE & A. SCOTT, *supra* note 6, § 7.12, at 280. Accordingly, generally it is the gravity of the risk created by the actor, rather than his or her awareness of that risk, which serves as the principal distinguishing fea-

ture between "depraved heart" murder and involuntary manslaughter. However, many of these jurisdictions have also enacted negligent homicide statutes which permit imposition of at least minor homicide liability even in cases where the perpetrator did not realize the risk created by his or her conduct. *Id.*

**33.** Although we use the phrase "misdemeanor-manslaughter rule" in this opinion, we recognize that the term may be something of a misnomer, in that felonies which might not otherwise suffice to give rise to felony murder liability, *see supra* note 15, might serve as a basis for "unlawful act" involuntary manslaughter liability. 2 W. LAFAVE & A. SCOTT, *supra* note 6, § 7.13(a), at 288. *See also* R. PERKINS & R. BOYCE, *supra,* at 112 n. 50.

**34.** *Malum in se* is defined as "[a] wrong in itself.... An act is said to be *malum in se* when it is inherently and essentially evil, that is, immoral in its nature and injurious in its consequences, without any regard to the fact of its being noticed or punished by the law of the state." BLACK'S LAW DICTIONARY 865 (5th ed. 1979). *Malum prohibitum* is defined as "[a] wrong prohibited ...; an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law...." *Id.*

■ In the District of Columbia, the misdemeanor-manslaughter doctrine has developed along substantially similar lines. Although the doctrine is established in the law in this jurisdiction, we have been mindful of the danger that the traditional misdemeanor-manslaughter rule, imposing involuntary manslaughter liability whenever a killing occurs in the commission of a misdemeanor *malum in se*, might cast too wide a net.[35] The risk of an unreasonable application of involuntary manslaughter liability is especially pronounced in view of the massive increase since the early common-law era in the number and forms of misdemeanors. In *Bradford v. United States, supra,* 344 A.2d at 215, we described as a variety of involuntary manslaughter a killing occurring "as the result of an unlawful act which is a misdemeanor involving danger of injury." The misdemeanor-manslaughter rule was applied in *United States v. Walker,* 380 A.2d 1388 (D.C.1977) ("*Walker I*"), a case in which the defendant, while allegedly carrying a pistol without a license, dropped it in the stairwell of an apartment building. The gun discharged, fatally wounding a bystander. *Id.* at 1389. Concluding that carrying a pistol without a license in violation of D.C. Code 22–3204 (1989), where the offense "result[ed] in the shooting and death of another," is a misdemeanor "dangerous in and of itself," the court reversed the trial court's dismissal of the involuntary manslaughter indictment brought against the defendant. *Id.* at 1391.[36] We think that the category of misdemeanors dangerous in and of themselves encompasses misdemeanors which bear an inherent danger of physical injury, and includes simple assault, D.C.Code § 22–504 (1989), the misdemeanor at issue in this case.

■ This limitation, however, is incomplete. Although some misdemeanors, at least when viewed in the abstract, prohibit activity which seems inherently dangerous, they may also reach conduct which might not pose such danger. A special difficulty arises in the case of simple assault, as presented here, because that misdemeanor is designed to protect not only against physical *injury*, but against all forms of offensive touching, *see Guarro v. United States,* 99 U.S. App.D.C. 97, 99–100, 237 F.2d 578, 580–81 (1956) (offensive sexual touching); *Ray v. United States,* 575 A.2d 1196, 1199 (D.C.1990) (spitting on another person), and even the mere threat of such touching. *Robinson v. United States,* 506 A.2d 572, 574 (D.C.1986) (intent to frighten). To hold a defendant liable for involuntary manslaughter where a death freakishly results from spitting at another, putting one's hand on another in a sexually offensive manner, or lightly tapping another on the face, would create too severe an attenuation of the link between the criminal sanction imposed and the defendant's culpability. In such circumstances, there is no foreseeable risk of bodily injury of any appreciable sort.

Accordingly, the fact that death results in the commission of what is classified as

---

**35.** Despite its long-standing roots, the misdemeanor-manslaughter rule has been criticized in recent years. This criticism has been directed primarily at the absence of a foreseeability of harm requirement in misdemeanor-manslaughter. *See, e.g.,* R. PERKINS & R. BOYCE, *supra,* at 114; MODEL PENAL CODE, *supra,* § 210.3 comment 7, at 77. "[A]bout two-thirds of the modern [state] codes do not contain a manslaughter crime grounded in the defendant's death-causing unlawful act." 2 W. LaFAVE & A. SCOTT, *supra* note 6, § 7.13, at 287. In other jurisdictions, courts have abolished or refused to apply the misdemeanor-manslaughter rule. *See, e.g., Catalina, supra* note 32, 407 Mass. at 787, 556 N.E.2d at 978 (abandoning unlawful-act involuntary manslaughter except in cases where a battery causes death under "circumstances in which the defendant is, or should be, cognizant of the fact that the battery he is committing endangers human life"); *State v. Pray,* 378 A.2d 1322, 1324 (Me.1977) (defendant struck the victim in the chest with his forearm, causing victim to fall backward off porch and strike his head on the pavement; court criticized, and refused to apply, existing unlawful-act involuntary manslaughter doctrine in case tried before, and thus not governed by, enactment of new statutory regime which rejected unlawful-act manslaughter).

**36.** At trial, Walker was convicted "on a count charging 'involuntary manslaughter in perpetrating and attempting to perpetrate the crime of carrying a pistol without a license.'" *Walker v. United States,* 403 A.2d 1163, 1164 n. 1 (D.C. 1979) (per curiam) ("*Walker II*").

an inherently dangerous misdemeanor, is alone insufficient to establish guilt of misdemeanor involuntary manslaughter. Rather, the defendant must commit the misdemeanor in a way which is dangerous under the particular circumstances of the case. *See* 2 W. LaFave & A. Scott, *supra* note 6, § 7.13(e), at 298 ("the question [in unlawful-act involuntary manslaughter cases] ought to be not whether the crime is generally dangerous, but whether the defendant's conduct in the particular death-causing situation was *under the circumstances* dangerous" (emphasis added)).[37]

We think a misdemeanor will be dangerous under the circumstances if the manner of its commission entails a reasonably foreseeable [38] risk of appreciable physical injury.[39] If the manner in which an inherently dangerous misdemeanor is committed creates such a foreseeable risk of appreciable physical injury, the defendant should bear the consequences of criminal homicide if the result is not just bodily injury but death itself.[40] A killing resulting from a misdemeanor which does not satisfy the standard just described will be excused.[41]

**37.** Although the determination whether a misdemeanor is inherently dangerous is a legal question for the court, *see Walker I, supra,* 380 A.2d at 1391 (appellate court determined whether carrying a pistol without a license is "dangerous in and of itself"), the determination whether the perpetrator committed the misdemeanor in a manner such that appreciable bodily injury was a reasonably foreseeable result is a question of fact for the jury.

**38.** By foreseeable, we mean not that appreciable bodily injury must be the normal consequence of the conduct, but a possible consequence. *See, e.g., McKinnon v. United States,* 550 A.2d 915, 918 (D.C.1988) (contraction of hepatitis was not an unforeseeable consequence of injuring victim in such a way that she needed surgery and related medical treatment); *Baylor v. United States,* 407 A.2d 664, 668 (D.C.1979) (intervening ordinary negligence in medical treatment is a foreseeable consequence of infliction of a dangerous wound).

**39.** The same analysis applies to other misdemeanors. For example, although the court in *Walker I* concluded that carrying a weapon without a license in violation of D.C.Code § 22–3204 is dangerous in and of itself, that might be true only if the gun is loaded or displayed in a menacing fashion. For example, one is guilty of carrying a pistol without a license even if he or she carries an unloaded, but unlicensed, pistol. However, if he or she drops the pistol down a stairwell in a non-reckless fashion, and it hits someone on the head, causing death, it could not fairly be said that the manner in which the violation of the statute occurred involved a foreseeable risk of physical injury. On the other hand, if one carries a loaded pistol and drops it down a stairwell, and the gun discharges, causing death, the manner in which the violation of the statute occurred, that is, carrying the loaded pistol, could involve such a foreseeable risk. *See Walker II, supra* note 36, 403 A.2d at 1165 n. 2 (where there was evidence that appellant previously had been shot in the foot by a pistol—possibly the same pistol which caused the homicide at issue—the court found under the circumstances of the case

that the possibility that the gun may accidentally discharge and kill somebody was reasonably foreseeable). True, the court in *Walker II* stated that "[p]roximate cause, or foreseeability, is not an element of the offense of misdemeanor-manslaughter...." *Id.* at 1165. Whether this language constitutes a holding, in view of the court's finding that death was in fact foreseeable, is unclear. To the extent language in *Walker II* is inconsistent with our holding today, however, it must be rejected.

**40.** We note that some courts and commentators either require or suggest that the actor's conduct must create a reasonably foreseeable risk of death or serious bodily injury, not merely appreciable bodily injury, before misdemeanor-manslaughter liability should attach. *See, e.g., Catalina, supra* note 32, 407 Mass. at 787, 556 N.E.2d at 978 (preserving unlawful-act manslaughter for death resulting from a battery "in circumstances in which the defendant is, or should be, cognizant of the fact that the battery he is committing endangers human life"); *Pray, supra,* 378 A.2d at 1324 ("perceptibility of risk of death or serious bodily harm" should be imported as an element of unlawful-act involuntary manslaughter); *see also* R. Perkins & R. Boyce, *supra,* at 114 (homicide in the course of a misdemeanor should be excused "if death resulted so unexpectedly that no reasonable person would have foreseen it"). Our adoption of a standard incorporating foreseeability of a risk of appreciable bodily injury, and indeed the continuing vitality of the misdemeanor-manslaughter doctrine itself, is justified by the fact that the standard of risk-creation required to sustain a reckless involuntary manslaughter conviction in this jurisdiction is unusually high, *see supra* note 32, as well as the fact that we have no general negligent homicide statute to punish homicides resulting from unreasonable but not necessarily reckless conduct, as the latter phrase is defined in our homicide law. *See supra* note 6.

**41.** Just as with voluntary manslaughter, *see supra* note 19, if the jury is properly instructed on

In sum, it can be seen that as a whole, the law of homicide is broadly symmetrical. The four mental states recognized as malicious for purposes of second-degree murder exist in manslaughter, as well. One who acts with the specific intent to kill or to inflict serious bodily injury is guilty of murder. If those two states of mind are accompanied by recognized circumstances of mitigation, however, the crime is voluntary manslaughter. (It is conceivable that voluntary manslaughter liability might arise where one, acting under circumstances of mitigation, consciously disregards an extreme risk of death of serious bodily injury, but such scenarios seem highly improbable.) The other two malicious mental states also have corollaries in the involuntary manslaughter category. One who acts in conscious disregard of an extreme risk of death or serious bodily injury is guilty of murder, but if he or she is only unreasonably unaware of such a risk, the crime is involuntary manslaughter. Finally, one who kills in the course of a felony enumerated in D.C.Code § 22–2401 is guilty of murder, but one who kills in the commission of a misdemeanor, *cf. supra* note 33, under the circumstances described above is guilty of involuntary manslaughter.

## IV. THE INSTANT APPEALS

Guided by the foregoing discussion of the law of manslaughter, we turn now to an assessment of the manslaughter instructions in appellants' cases. We conclude that the jury instructions given in each case were erroneous.

### A. *Appellant Comber*

 Both the voluntary and involuntary manslaughter instructions given in appellant Comber's case misstated the law as above explicated in significant respects.[42] With regard to voluntary manslaughter, the trial court's instruction erroneously defined the mental states required for the offense. The trial court instructed the jury that to prove voluntary manslaughter, the government had to prove that the defendant committed an unjustified or unexcused killing, and that the defendant intended to commit the acts which caused death. The trial court then explained that to prove a killing was without justification or excuse, the government had to prove that the defendant did not kill in self-defense. In effect, then, the trial court instructed the jury that as long as he was not acting in self-defense, appellant Comber was guilty of voluntary manslaughter if he intended to commit some act which in fact caused Joseph Pinkney's death, no matter how unexpectedly. As is plain from our discussion above, however, to be guilty of voluntary manslaughter, a person must intend to kill, intend to inflict serious bodily injury, or act in conscious disregard of an extreme risk of death or serious bodily injury. Although a voluntary manslaughter conviction is proper only where the defendant acts with a state of mind which, but for the presence of mitigating factors, would support a second-degree murder conviction, the instructions in appellant Comber's case permitted the jury to find him guilty if it found only that he intended to

the foreseeability of appreciable bodily injury standard, the absence of justification or excuse element of involuntary manslaughter ordinarily will already be incorporated into the definition of the offense. Accordingly, absent circumstances of justification or rare forms of excuse which seldom arise, the trial court need only charge the jury separately as to the requirement that the killing be without justification or excuse where there is evidence of self-defense.

**42.** The government argues that appellant Comber failed to object to the specific wording of the instructions, and that any error should thus be viewed under the plain error standard. We disagree. The record demonstrates that when

the trial court proposed giving a voluntary manslaughter instruction, counsel for Comber immediately objected. During an extended colloquy conducted over the course of two days, the parties discussed at length whether a killing resulting from the intentional application of force against an individual, not motivated by an intent to kill or inflict serious bodily injury, constitutes voluntary or involuntary manslaughter. Appellant Comber's position was clear that a killing resulting from a simple assault constitutes involuntary manslaughter of the misdemeanor-manslaughter variety, not voluntary manslaughter.

commit some act which resulted in death.[43] The instruction thus allowed the jury to convict Comber of voluntary manslaughter where his mental state and conduct would not constitute that offense.[44]

 The involuntary manslaughter instruction given in Comber's case was also erroneous. The instruction described the criminal negligence variety of involuntary manslaughter, not the misdemeanor-manslaughter variety. Had the trial court not modified the standard "redbook" instruction to limit involuntary manslaughter only to deaths resulting from unintentional acts, it would properly have defined the elements of criminal negligence involuntary manslaughter.[45] The instruction properly described the degree to which appellant's conduct had to deviate from a reasonable person standard and the gravity of the risk required to support an involuntary manslaughter conviction. However, the addition that the jury could find appellant guilty of involuntary manslaughter only if it concluded that appellant Comber's conduct was not intentional was an incorrect statement of law. Although it is true that an involuntary manslaughter conviction is appropriate only where *death* is uninten-

tional, the offense is not limited to killings resulting from death-producing *conduct* which is unintentional. In fact, many intentional acts, provided that they either involve the creation of the requisite risk of death or constitute inherently dangerous misdemeanors committed in such a way that appreciable bodily injury is a foreseeable result, may constitute involuntary manslaughter. The instructions given in appellant Comber's case thus precluded the jury from finding him guilty of involuntary manslaughter under circumstances where such a verdict might have been appropriate.[46]

## B. *Appellant Hayward*

Two types of instructional error similarly occurred at appellant Hayward's trial. First, the trial court gave the standard voluntary manslaughter instruction, which erroneously defines that offense.[47] Second, the trial court refused to give an involuntary manslaughter instruction upon the defendant's request.

 Unlike the voluntary manslaughter instruction given in appellant Comber's case, the voluntary manslaughter instruction in appellant Hayward's case contained

---

**43.** As noted above, voluntary manslaughter is not a general intent crime in the sense suggested by the instructions here. *See supra* note 21.

**44.** Indeed, since nothing was said about justification or excuse other than self-defense, the instruction would have permitted a voluntary manslaughter conviction on the basis of conduct which does not amount to criminal homicide at all. Under the instructions given here, a person who, acting in a completely non-negligent fashion, intentionally committed a lawful act which freakishly caused the death of another would be guilty of voluntary manslaughter.

**45.** Under the circumstances of the case, the trial court's modified explanation of the circumstances constituting justification or excuse was proper. *See supra* note 41.

**46.** Appellant Comber also correctly argues that the trial court erred in instructing the jury that involuntary manslaughter is a lesser-included offense of voluntary manslaughter, and that it could consider the involuntary manslaughter charge only if it first found appellant not guilty of voluntary manslaughter. *See supra* note 3. This error alone could require reversal, some-

thing we need not here decide. In *Bradford, supra,* 344 A.2d at 218, we stated: "[I]f the [trial] Court allows the Government to go to the jury on both [voluntary and involuntary manslaughter] counts, it should not be in the nature of lesser included offenses but instead in the nature of legally inconsistent counts which will require the alternative verdict instruction." The trial court accordingly should not instruct the jury that it may consider involuntary manslaughter only if it has acquitted appellant of the greater offense of voluntary manslaughter. *Cf. Jones v. United States,* 544 A.2d 1250, 1254 (D.C.1988) (error to reinstruct deadlocked jury on "acquittal first" instruction). Because voluntary manslaughter is typically deemed a more serious offense than involuntary manslaughter, however, the trial court may direct the jury to consider voluntary manslaughter first in its deliberations.

**47.** The government contends that appellant Hayward never objected to the wording of the voluntary manslaughter instruction, and that we must review that contention under the plain error standard. It is uncontested, however, that Hayward vigorously requested an involuntary manslaughter instruction, a request denied by the trial court.

no description of the mental state required for the offense but included a definition of justification and excuse. The instruction given to the jury thus contained, in effect, the classic common law definition of the undifferentiated crime of manslaughter. As a *voluntary* manslaughter instruction, it is thus over-inclusive. The instruction makes voluntary manslaughter of all unexcused homicides, including involuntary manslaughter of both the criminal negligence and misdemeanor varieties. Indeed, given the instruction's truncated description of the circumstances which would excuse a homicide,[48] the instruction might even permit a voluntary manslaughter conviction in cases where no homicide liability would be appropriate. Furthermore, under the instructions given by the trial court, the jury was authorized to find Hayward guilty of voluntary manslaughter without ever finding that he acted with the mental state required for that offense.

 In addition, apparently persuaded by the prosecutor's argument that involuntary manslaughter is restricted to cases in which death results from an unintentional act, the trial court ruled that an involuntary manslaughter instruction would be inappropriate. However, involuntary manslaughter is by no means limited to cases in which death results from an unintentional act. An intentional act or intentional conduct done with no aim to cause death or serious bodily injury will constitute involuntary manslaughter if it creates an extreme risk of death or serious bodily injury and amounts to non-conscious recklessness. Alternatively, an intentional act which causes death is involuntary manslaughter if it is a misdemeanor dangerous in and of itself which is committed in a manner such that appreciable bodily injury to the victim was a reasonably foreseeable result. The evidence in appellant Hayward's case was sufficient to support an involuntary manslaughter jury instruction under either theory. *Day v. United States*, 390 A.2d 957, 962 (D.C.1978), *overruled on other grounds, Graves v. United States*, 490 A.2d 1086 (D.C.1984) (en banc) (lesser-included offense instruction is appropriate where there is any evidence, however weak, sufficient to support a conclusion that the defendant is guilty of the lesser rather than the greater offense). Appellant Hayward was entitled to an involuntary manslaughter instruction which the trial court declined to give.[49]

## C. *Disposition*

 At bottom, the key element of discussion in this case is not whether appellants were improperly convicted of manslaughter, but whether they were convicted of the proper type of manslaughter. *See Williams v. United States*, 105 U.S.App. D.C. 348, 267 F.2d 625 (1959) (per curiam) (where defendant struck decedent who fell to the ground, hit his head, and later died, court affirmed conviction for undifferentiated crime of manslaughter). Because the punishment for both forms of manslaughter is governed by a single statutory provision, at first blush it may seem that a proper disposition of these cases might simply be to remand for resentencing for involuntary, rather than voluntary, manslaughter. However, appellant Comber may be entitled to a new trial on a distinct ground of instructional error. *See supra* note 46. We recognize, moreover, that to the extent

**48.** The instructions provided, in pertinent part: "Excusable homicide occurs where the person who kills although himself at fault had the legal right so to kill or where the killing was the accidental result of a lawful act done in a lawful manner." As the discussion above demonstrates, however, a homicide resulting from a lawful act is excused so long as it does not involve conduct which creates "extreme danger to life or of serious bodily injury" and does not amount to "a gross deviation from a reasonable standard of care." *Faunteroy, supra*, 413 A.2d at 1298–99. Moreover, even a death resulting from an unlawful act is excusable provided that the unlawful act is not inherently dangerous or, if it is, that the defendant did not commit the act in such a way that appreciable bodily injury was a reasonably foreseeable result. The voluntary manslaughter instruction thus failed to explain that accidental killings resulting from some types of unlawful acts, as well as those resulting from lawful acts committed in an unlawful, *i.e.*, simply negligent, fashion, do not constitute manslaughter of any type.

**49.** Because of our disposition of the case on grounds of instructional error, we need not decide whether appellant's prosecutorial misconduct allegations, standing alone, would warrant reversal.

appellants could have been convicted of involuntary, rather than voluntary, manslaughter, it might well have been on the basis of a misdemeanor-manslaughter theory.[50] Just as the jury must decide in a felony-murder case that the defendant committed the underlying felony, *Turner v. United States*, 459 A.2d 1054, 1057 (D.C. 1983), so too should the jury decide in a misdemeanor-manslaughter case that the defendant committed the underlying misdemeanor and in such a manner that appreciable physical injury was reasonably foreseeable. Conversely, in both cases, the evidence could have supported a jury finding that appellants acted with a state of mind which would have amounted to malice, but that each appellant killed in the heat of passion so that the killing was mitigated to voluntary manslaughter. Because the evidence was sufficient to support such a conclusion, the government is entitled to retry both appellants on the charge of voluntary manslaughter. We conclude under all the circumstances that retrial is appropriate for both appellants.[51]

*Reversed and remanded.*

---

**50.** The government also might have proceeded on a recklessness theory, on the view that appellants created an extreme risk of death or serious bodily injury by forcefully striking the decedents in the face.

**51.** We do not rule on the applicability of this decision either to convictions already final or to cases currently pending in which the litigants have not raised an appropriate challenge to the manslaughter instructions. *See generally Mendes v. Johnson*, 389 A.2d 781 (D.C.1978) (en banc).