Linda JOHNSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 90–CO–1321, 92–CO–299.

District of Columbia Court of Appeals.

Argued May 19, 1993.
Decided Sept. 9, 1993.

Andrew S. Miller, Law Student Counsel, with whom Steven H. Goldblatt, Supervising Atty., and Maria M. Das Neves, Law Student Counsel, were on the brief, for appellant.

Chrisellen R. Kolb, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher, Roy W. McLeese III, June M. Jeffries, John M. Facciola and Linda L. Mullen, Asst. U.S. Attys., were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and MACK, Senior Judge.

MACK, Senior Judge:

Appellant, Linda Johnson, was charged with cruelty to children, D.C.Code § 22–901 (1989 Repl.), and second-degree murder, D.C.Code § 22–2403 (1989 Repl.), for causing injuries to nine-month-old Jamie Banker, by shaking her, hitting her head against a wall, and dropping her, all of which resulted in the infant's death. Appellant entered a plea of guilty to voluntary manslaughter in exchange for dismissing the charges of cruelty to children and second-degree murder. Appellant was sentenced to a term of imprisonment of fifteen years to life on January 18, 1990.[1]

In May of 1990, appellant filed a motion to reduce the sentence and an addendum, which was denied on July 6, 1990. Pursuant to D.C.Code § 23–110 (1989 Repl.), appellant filed a motion to withdraw her guilty plea on grounds that it lacked a factual basis to support her voluntary manslaughter plea. The trial court denied appellant's motion on October 4, 1990, and appellant noted an appeal. At the trial court's request, appellant filed a motion to reconsider the denial of her motion to withdraw her guilty plea on January 17, 1991.[2] Following hearings on the motion, the trial court denied appellant's motion on March 2, 1992. Appellant now appeals the trial court's denial of her motion to withdraw the guilty plea and the denial of reconsideration of that request.[3]

## I.

### A. The Plea Hearing

At the plea hearing on November 9, 1989, the trial judge had appellant's counsel explain the plea agreement, and told appellant that if she did not understand it, or if it was different from what she had agreed to, to advise the court. The government made its factual proffer stating that appellant worked as a live-in baby sitter for Mr. and Mrs. Banker. During appellant's interview for this job, she misrepresented that she previously had been a baby sitter for five years for two other young children in the area, but had to leave her employment when the mother of the children decided to stay home with them. In reality, appellant was not a baby sitter for this family which did not have any children; rather, she cleaned their house on several occasions.[4]

At the outset of the government's proffer, appellant's counsel emphasized as part of the plea agreement that the proffer factually would consist of appellant's video-taped statement which represented her version of what had transpired.[5] On January 23, 1989, exactly one week after appellant began her employment with the Bankers, appellant telephoned Jamie's mother at her job informing her that she had found Jamie breathing unnaturally with her eyes rolled back. Mrs. Banker told appellant to call Jamie's pediatrician, who instructed appellant to call an ambulance, which she did. After performing a CAT scan at Georgetown University Hospital, the doctors found that Jamie suffered multiple massive

---

1. At the plea hearing, appellant's counsel informed the court that the government intended to file "life papers," i.e., papers which would expose appellant to a sentence of up to life imprisonment as a consequence of at least two prior felony convictions, instead of a sentence of five to fifteen years which is otherwise the maximum for unarmed manslaughter.

2. Two and one-half months after the trial court denied appellant's motion to withdraw her guilty plea, this court decided *Comber v. United States,* 584 A.2d 26 (D.C.1990) (en banc), which held that "voluntary manslaughter is a killing committed with an intent to kill or do serious bodily injury, or with a conscious disregard of

an extreme risk of death or serious bodily injury." *Id.* at 47. The trial court invited appellant to file a motion to reconsider the court's prior ruling so that it might assess the impact, if any, of the *Comber* decision.

3. This court consolidated the two appeals.

4. Appellant did care for an infant who lived next door to the family whose house she cleaned; however, appellant had been terminated from that employment.

5. The transcript of appellant's videotaped statement is not part of the record on appeal.

skull fractures, a cerebral edema, hematoma, and hemorrhaging. Based on the medical tests, the doctors suspected that Jamie's injuries were caused by severe physical abuse, and they notified the Youth Division of the Metropolitan Police Department. Appellant indicated to the Bankers, to the hospital personnel, and initially, to the police that "nothing had happened to the child." After further questioning, the appellant told the police that Jamie had rolled off the changing table several days earlier, but believed that she was not seriously injured. At the time of her arrest, appellant told police officers that Jamie had been crying, and in an effort to quiet her, appellant had thrown her approximately six feet up in the air a couple of times, and that on the third time, appellant dropped her and Jamie struck her head during the course of the fall.

Two days after her arrival at the hospital, the doctors determined that Jamie was "brain dead" and terminated the life support measures. An autopsy on the infant revealed that the cause of death was blunt force injury to the head, including massive skull fractures with two distinct sites of impact. The government asserted that medical experts would have testified at trial that the injuries Jamie sustained were inconsistent with a simple fall. Evidence of retinal hemorrhaging in the eyes revealed severe shaking of the infant, and the other medical evidence was consistent with Jamie's head having been struck against a wall.

Appellant acknowledged that Jamie had died in a manner consistent with the government's proffered testimony in that Jamie's death was caused by severe shaking and her head having been struck against a wall. Appellant substantially acknowledged the factual proffer of the government. Appellant, however, denied having "slammed" Jamie against the wall, and in response to the court's question as to what appellant did do, she stated:

> [A]fter I had sit [sic] her up on the dressing table, I was talking to her and I shook her trying to ask her what was wrong with her; baby, what is the matter; why do you keep crying so much. Her head hit the wall. I didn't realize her head was hitting the wall until, I guess, I snapped back to myself, and when I realized what had happened, that is when I picked her up and felt her head.

Appellant testified that she believed Jamie's head hit the wall about four times. Appellant further testified that she was not angry with Jamie while she was shaking her, and that

> I realized I had shook her, but I didn't realize her head was hitting the wall. I didn't realize that. It was like—it was like I wasn't even aware of it for a few seconds and then when I did come back to myself of what was really happening, that's when I went upstairs to try to get help for her and used the phone.

Appellant's counsel assured the court that this was not a case of momentary insanity or accident, and that based on appellant's videotaped statement, appellant's actions constituted voluntary manslaughter. The trial judge stressed that while the government's evidence more than adequately supported a voluntary manslaughter plea, he was doubtful as to whether appellant admitted sufficient facts to establish a factual basis for the plea. Following further discussion, the trial judge concluded that based on the government's undisputed proffer, primarily the autopsy results, it would be irrational to conclude that anybody in appellant's position could have shaken Jamie to that extent and repeatedly hit her head against the wall, without knowing what she was doing.

The trial judge proceeded with the Rule 11 inquiry and appellant assured the court that she was not being pressured and that

> I'm pleading guilty because I feel that I'm guilty, Your Honor, to a certain extent.... I feel that what happened, the shaking, the baby's head hitting resulted in her dying, which I am so sorry for her. But, I still say I wasn't aware of the extent of what was going on. It was like I lost control, you know.

After a long discussion with her counsel and the trial judge, appellant confirmed her intention to plead guilty to voluntary manslaughter, and also that she was satisfied with her counsel.

### B. *Appellant's Motions to Withdraw the Guilty Plea*

The gravamen of appellant's initial motion, filed on August 1, 1990, is that during the plea proceeding she did not acknowledge sufficient facts to support a factual basis for her voluntary manslaughter plea. Appellant contends that malice, although mitigated, is a necessary element of voluntary manslaughter and that she did not admit to any facts constituting malice. The trial judge, relying on pertinent case law,[6] denied this motion concluding that malice is not an element of voluntary manslaughter in this jurisdiction, and that even if it were, appellant's acknowledged conduct of shaking an infant and knowing its head hit the wall constituted malice despite her assertions of her lack of intent to injure Jamie.

Shortly after the trial judge denied appellant's motion, this court decided *Comber v. United States, supra* note 2, 584 A.2d at 44 n. 22, which attempted to resolve ambiguities in the *Bradford* decision regarding the elements of voluntary manslaughter. As a consequence of *Comber, supra,* the trial judge invited appellant to file a motion to reconsider the court's prior ruling denying appellant's motion to withdraw her guilty plea so that the court might assess what impact, if any, the *Comber* decision may have on that ruling. Appellant filed her motion and alleged that she failed to acknowledge sufficient facts during the plea proceeding to provide a factual basis for pleading guilty to voluntary manslaughter which would support that she acted with malice. Appellant also claimed that her plea was involuntary because she did not receive real notice of the true nature of the charges against her.

In an extensive and well reasoned order, the trial court denied appellant's motion to reconsider the denial of her motion to withdraw the guilty plea. The trial court concluded that the *Bradford* decision and other pre-*Comber* precedents, at the time of appellant's plea of guilty, warranted that voluntary manslaughter required a general intent to do the acts which caused the decedent's death and did not require malice, so that even if the appellant's plea were involuntary under *Comber, supra,* the *Comber* decision should not be applied retroactively to invalidate her plea on collateral attack. The trial court did conclude, however, in its pre-*Comber* order that the plea proceeding, taken in its entirety, reflected sufficient conduct on the part of appellant to constitute malice. The trial court also concluded that under *Comber, supra,* appellant's knowing conduct showed the requisite mental state necessary to a finding of voluntary manslaughter. We agree, and therefore affirm the orders of the trial court.

### II.

A guilty plea may be withdrawn after sentencing only if the defendant affirmatively establishes that the trial court's acceptance of her plea was manifestly unjust, and that the plea proceeding was fundamentally flawed such that there was a complete miscarriage of justice. *See Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962); *see also Morrison v. United States,* 579 A.2d 686, 689 (D.C.1990). In the absence of "manifest injustice," the trial court must deny appellant's motion, and this court may overturn the trial court's denial only for an abuse of discretion. *See Hicks v. United States,* 362 A.2d 111, 113 (D.C.1976) (per curiam) (citing *Bettis v. United States,* 325 A.2d 190, 195 (D.C.1974)). Under Super.Ct.Crim.R. 32(e),[7] there must also be a

---

6. *See United States v. Bradford,* 344 A.2d 208, 214 (D.C.1975) (defining manslaughter, voluntary or involuntary, as an "unlawful killing of a human being without malice, express or implied") (citation omitted).

7. Super.Ct.Crim.R. 32(e) sets forth the standard for the withdrawal of guilty pleas:

A motion to withdraw a plea of guilty or of nolo contendere may be made only before sentence is imposed or imposition of sentence

showing of prejudice to appellant to establish that manifest injustice did occur. *Id.* No such abuse appears in the particular circumstances of this case.

Appellant, relying on *Henderson v. Morgan*, 426 U.S. 637, 643–44, 96 S.Ct. 2253, 2256, 49 L.Ed.2d 108 (1976), contends that her plea was involuntary because her counsel and the trial court did not apprise her of the true nature of the charge against her. Specifically, appellant asserts that she was misinformed about the malice element of voluntary manslaughter, that she did not admit facts that would imply that she acted with an intent to harm or kill or with conscious disregard for life, and that she was prejudiced by the court's and counsel's misrepresentations because if she had understood the elements of voluntary manslaughter, she would not have agreed to plead guilty.

This court's determination of whether appellant's plea was voluntary as a matter of due process under *Henderson, supra*, requires an examination of the entire record and an analysis of the totality of the circumstances surrounding the plea. *See McClurkin v. United States*, 472 A.2d 1348, 1356 (D.C.) (citing *Henderson, supra*, 426 U.S. at 644, 96 S.Ct. at 2257), *cert. denied*, 469 U.S. 838, 105 S.Ct. 136, 83 L.Ed.2d 76 (1984). In *McClurkin, supra*, we determined that "[t]he critical inquiry is whether a defendant has been apprised adequately of the substance of an offense, rather than of its formal legal components." *Id.* (citation omitted). The surrounding circumstances relevant to this court's inquiry concerning voluntariness include "the complexity of the charges, the personal characteristics of the defendant, the defendant's familiarity with the criminal justice system, and the factual basis proffered to support the court's acceptance of the plea." *Id.* (citation omitted).

In examining the complexity of the charge, we look to the relevant case law

both at the time of the plea proceeding and also at the subsequent hearings [8] to assess the impact of *Comber, supra*. The trial court concluded that appellant's conduct provided a factual basis to support the court's acceptance of her voluntary manslaughter plea under both *Bradford, supra*, and *Comber, supra*. The *Bradford* decision held that:

> The elements of voluntary manslaughter in the District of Columbia—the unlawful killing of a human being without malice—could more accurately be said to be (1) an unlawful killing of a human being (2) with malice which has been mitigated by the presence of circumstances judicially recognized as reducing the degree of criminality.

344 A.2d at 215. The *Bradford* decision asserted that the requisite intent for voluntary manslaughter requires a general intent to commit the act which caused the death rather than a specific intent to cause the death itself. *Id.* at 214; *see also Turner v. Travelers Ins. Co.*, 487 A.2d 614, 615 (D.C.1985) (stating same). Based on this reasoning, the trial court properly concluded that appellant's express acknowledgment that she shook the infant victim, her implicit admission that she knew the infant's head was hitting the wall as she shook it, and her acknowledgment that these actions caused the infant's death were sufficient, as a matter of law, in the absence of any justification or excuse, to admit the offense of voluntary manslaughter.

In *Comber, supra*, we held that "to be guilty of voluntary manslaughter, a person must intend to kill, intend to inflict serious bodily injury, or act in conscious disregard of an extreme risk of death or serious bodily injury." 584 A.2d at 52. In this jurisdiction, an act in conscious disregard of an extreme risk of death or serious bodily harm exists only where the defendant was subjectively aware that her conduct created such a risk. *Id.* at 39. Appel-

---

is suspended; but to correct manifest injustice, the Court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea.

8. Two hearings on appellant's motion to reconsider the denial of her motion to withdraw the guilty plea were held on May 2 and September 11, 1991.

lant contends that she did not intend to kill or injure Jamie, nor was she subjectively aware of the extreme risk to which she was subjecting the child. Appellant, accordingly, argues that lacking a factual basis to support her voluntary manslaughter plea, the court abused its discretion in denying her motion to withdraw her guilty plea.

■ *Comber, supra,* equated the mental state necessary for voluntary manslaughter with malice. Extremely negligent conduct which creates an unjustifiable and a very high degree of risk of death or serious bodily injury to another, without any intent to do either, may constitute murder. *Id.* at 39 n. 11 (quoting 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.4, at 199–200 (1986)). One type of conduct that has been held to involve a very high degree of extreme risk of death or serious bodily harm, i.e., malice, is "shaking an infant so long and so vigorously that it cannot breathe." 2 W. LaFave & A. Scott, *supra,* § 7.4, at 202–203.

■ The trial judge in this proceeding had a substantial basis for determining that appellant understood the nature of the voluntary manslaughter plea. Unlike the defendant in *Henderson, supra,* where there was no discussion of the elements of the offense charged and no indication that the nature of the offense had ever been discussed with the defendant, and no reference to the intent requirement necessary to cause the victim's death, here, the appellant was fully apprised of the nature of the offense and the elements constituting both voluntary and involuntary manslaughter at the plea proceeding under *Bradford, supra.*

Further, at the two hearings following appellant's motion to reconsider the denial of the motion to withdraw her guilty plea, the trial court remained persuaded that appellant's acknowledged conduct of shaking the infant, and her conscious awareness that its head hit the wall four times while she shook it, demonstrated a wanton disregard of an unreasonable human risk consti-

tuting the malice element set forth in *Comber, supra,* 584 A.2d at 39.

We agree with the reasoning of the trial court in its denial of appellant's initial motion to withdraw her guilty plea, that her conduct in shaking a nine-month-old infant while aware that the child's head was repeatedly hitting the wall involved such a wanton and willful disregard of an unreasonable human risk constituting malice, even if there was not an actual intent to kill or injure the infant, and that appellant's knowledge that the infant's head hit the wall "about four times," reflects both the wantonness of her actions and the subjective awareness of the extreme risk of death or serious injury to the infant.

In considering the totality of the circumstances surrounding the plea, *McClurkin, supra,* 472 A.2d at 1356 (citing *Henderson, supra,* 426 U.S. at 644, 96 S.Ct. at 2257), this court may assess appellant's personal characteristics and her familiarity with the criminal justice system. Like the defendant in *McClurkin,* the appellant here had nearly completed high school, suffered from no apparent illness or infirmity at the time of her plea, and was well acquainted with the criminal justice system as a consequence of her significant prior criminal record.[9]

Further, the record reveals that the government's exhaustive factual proffer demonstrated that appellant's conduct constituted voluntary manslaughter. The trial judge extensively inquired into the appellant's decision to plead guilty to voluntary manslaughter pursuant to Super.Ct.Crim.R. 11(c). In response to the trial judge's question about whether she was pleading guilty voluntarily rather than solely on the advice of defense counsel, appellant responded:

> No, I don't feel, Your Honor, like he's forcing me to do anything, because he hasn't tried to force me. I feel that I made a video tape and I told exactly what happened. To my knowledge, from

9. Appellant had been convicted of forgery in three separate cases and for theft on the same day in Louisiana on June 7, 1973. Appellant

was also convicted of attempted distribution of heroin and forgery in Louisiana on September 26, 1974.

my attorney, that is a confession, you know, and to go to court and say that I didn't do something when I said that I did would be a waste, because I have already said that I did. I said exactly what happened on the video, also to spare the family the pain.

Further inquiry by the trial judge revealed that appellant expressed her understanding and certainty concerning the charges against her:

THE COURT: Are you satisfied that you want to proceed with your plea to voluntary manslaughter in this case, your plea of guilty to voluntary manslaughter?

THE DEFENDANT: Yes, sir.

THE COURT: And you want to do that?

THE DEFENDANT: Yes, sir.

THE COURT: Now, I want to know if you have any other questions or any other things that you want to talk to [your attorney] about or talk to me about before I accept your plea, because if there is anything that you don't understand or any reservations you have, this is the time to clear them up because once I accept your plea, it is very unlikely that I would ever let you withdraw your plea; do you understand what I have just said?

THE DEFENDANT: Yes, sir.

. . . . .

THE COURT: Do you have any other questions that you want to ask me and [your attorney]?

THE DEFENDANT: No, sir.

THE COURT: Are you satisfied that you still want to plead guilty?

THE DEFENDANT: Yes, sir.

We are satisfied that the trial judge who accepted appellant's plea had an adequate basis for determining that a factual foundation to support the voluntary manslaughter plea existed and that appellant understood the nature of the charges against her. Appellant, therefore, has failed to demonstrate a showing of prejudice or that manifest injustice did occur. *See Morrison, supra,* 579 A.2d at 689. Since we agree with the trial judge's interpretation of voluntary manslaughter and that appel-

lant's plea was knowing and voluntary under both the *Bradford* and *Comber* opinions, we do not base our decision on whether *Comber, supra,* should be applied retroactively on collateral attack. *See Gilmore v. Taylor,* —— U.S. ——, ——, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306 (1993); *Teague v. Lane,* 489 U.S. 288, 305–306, 109 S.Ct. 1060, 1073, 103 L.Ed.2d 334 (1989) (stating that new rules generally should not be applied retroactively to cases on collateral review); *Fields v. United States,* 466 A.2d 822, 828 (D.C.) (holding the need for finality as a consideration in balancing the competing interests of society and a criminal defendant's rights), *cert. denied,* 464 U.S. 998, 104 S.Ct. 497, 78 L.Ed.2d 690 (1983).

"In light of the totality of circumstances surrounding appellant's plea, including the government's comprehensive factual proffer, appellant's admission of the accuracy of that proffer ... appellant's prior experience with the criminal justice system, and finally the thorough colloquy between the court and appellant, we are satisfied that the trial judge in the guilty plea proceeding took adequate steps to insure that appellant understood the nature of the offense to which [she] pleaded guilty, and conclude on that basis that appellant's plea was made intelligently and voluntarily." *McClurkin, supra,* 472 A.2d at 1357. The order of the trial court accordingly is

*Affirmed.*

FARRELL, Associate Judge, concurring:

This is not at all an easy case to decide. Had appellant gone to trial on the charge of second-degree murder, the government would have had ample proof that she possessed the *mens rea* for that offense from the massive extent of the child's injuries alone. For this reason, one can hardly question the wisdom of appellant's attorney's advice to her to accept a plea of guilty to voluntary manslaughter—when, as I see it, there would have been no basis for a lesser included offense instruction on that charge had she stood trial. But notwithstanding the sufficiency of the government's proffered evidence and the wisdom of appellant's plea of guilty, "the plea

could not be voluntary in the sense that it constituted an intelligent admission that [s]he committed the offense unless the defendant received 'real notice of the true nature of the charge against [her], the first and most universally recognized requirement of due process.' " *Henderson v. Morgan*, 426 U.S. 637, 645, 96 S.Ct. 2253, 2257, 2258, 49 L.Ed.2d 108 (1976) (citation omitted). And that is the rub in this case: A fair reading of the record reveals that at the plea proceeding everyone—the trial judge, appellant's counsel, and the prosecutor—believed, in mistaken reliance on language in *United States v. Bradford*, 344 A.2d 208 (D.C.1989), that a conviction for voluntary manslaughter could be had even if at the time of the offense appellant lacked both an intent to kill or seriously wound the victim and (equivalently) a subjective awareness that her conduct created an extreme risk of death or serious bodily injury—in a word, lacked malice. To the contrary, as we made clear in *Comber v. United States*, 584 A.2d 26 (D.C.1990) (en banc), "*Bradford* ... limit[ed] the scope of voluntary manslaughter to killings where the perpetrator acts with a state of mind which, but for the presence of recognized mitigating factors, would render the killing malicious, and hence murder." *Id.* at 45.

Because neither the trial judge nor appellant's counsel explained to her that a plea of guilty to voluntary manslaughter would entail admitting that she acted, at the least, with "conscious disregard of an extreme risk of death or serious bodily injury," *Comber*, 584 A.2d at 47, the government must rely upon the asserted presence in the plea record of "a substitute ... [for] an explanation to [the] defendant of the nature of the offense [that] was omitted, *i.e.*, an admission by defendant to the trial judge necessarily implying guilt of the offense to which [s]he pleaded guilty." *McClurkin v. United States*, 472 A.2d

1348, 1358 (D.C.1984), citing *Henderson*, 426 U.S. at 646, 96 S.Ct. at 2258 ("[defendant] made no factual statement or admission necessarily implying that he had [the requisite] intent").[1]

If "necessarily" in this context meant that the record must permit but the single conclusion that appellant admitted to the required *mens rea* for voluntary manslaughter, then I could not join in affirming the denial of her motion to withdraw. The plea record contains enough ambiguity as to what precisely she was admitting that one cannot say the record *compels* the trial judge's finding that appellant admitted knowledge amounting to malice. In my view, however, this court does not review such a finding *de novo*. Ultimately, of course, the question whether a defendant's guilty plea was voluntary is a legal one, as is the question whether facts the defendant admitted constituted an admission of the elements of a given offense, including the state of mind. Thus the trial judge's conclusion that appellant's "conduct in shaking a nine-month old infant while aware that the child's head was repeatedly hitting a wall involved such a wanton and willful disregard of an unreasonable human risk as to constitute malice" is one we review for its legal correctness—though, assuming this "aware[ness]," it is an undeniably correct conclusion. But the decisive question in this case is the *factual* one of whether appellant actually admitted she knew the child's head was striking the wall when she shook it,[2] for only then would she be admitting to the required "subjective[ ] aware[ness]" of extreme risk of death or serious bodily injury. *Comber*, 584 A.2d at 39. And because that inquiry was made in the first instance by the trial judge, who heard appellant's plea statements, repeatedly questioned her about them, and observed her demeanor as she spoke, I believe we must defer to the judge's an-

1. Appellant concedes in her brief that, under *Henderson* and *McClurkin*, "[a]n implied admission by Ms. Johnson that she acted ... with conscious disregard for life[ ] could serve as a substitute for a correct explanation to her of the elements of voluntary manslaughter."

2. The government does not, on this record, seek to analyze the case as one involving the "shaking [of] an infant so long and so vigorously that it cannot breathe." 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.4, at 202–03 (1986). The cause of death was blunt force injury to the head.

swer for the reason that this court cannot replicate the inquiry or the trial judge's vantage point. *See Davis v. United States,* 564 A.2d 31, 34 (D.C.1989) (en banc). Consequently, when the trial judge is aware of the correct legal standard, as here, and finds as a fact that the defendant admitted conduct and awareness that—in our legal judgment—constitutes voluntary manslaughter, we may reverse that finding only if it is clearly erroneous. D.C.Code § 17–305(a) (1989).

Applying this standard of review, I agree that we must sustain the finding which Judge Greene made as follows:

> Critical to the court's conclusion [that the defendant's conduct revealed malice] ... is the defendant's admission that as she was shaking the decedent, she knew the child's head hit the wall "about four times." No one else was present during the killing of the decedent other than the defendant; consequently, the defendant's consciousness of the number of times the child's head hit the wall could have resulted *only* from the defendant's knowledge of what she was doing at the time she was doing it. Her contention at an earlier point in the plea proceeding that she did not know the decedent's head was hitting the wall strains both reason and credulity and need not be accepted by the court in view of her later admission to the contrary. [Emphasis by trial judge; record citations omitted.]

Appellant repeatedly told the judge that she did not know the child's head was hitting the wall, and argues from this that at most she was admitting to an accidental homicide (*i.e.,* gross negligence), not voluntary manslaughter. But, taken as a whole, her statements allowed the trial judge reasonably to find that her denials—contradicted by other statements she made—were really in the nature of an excuse for behavior (a sort of diminished capacity defense) rather than a denial of awareness that she was allowing the child's head to strike the wall. One of appellant's most telling exchanges with the court was as follows:

> THE DEFENDANT: I'm pleading guilty because I feel that I'm guilty, Your Honor, to a certain extent. This is why I am pleading guilty.
>
> THE COURT: What do you mean to a certain extent?
>
> THE DEFENDANT: I feel that what happened, the shaking, the baby's head hitting resulted in her dying, which I am so sorry for her.
>
> But, I still say I wasn't aware of the extent of what was going on. It was like I lost control, you know.
>
> Had I been able to control myself, I would have and it never would have happened.
>
> THE COURT: Why did you lose control, ma'am? Why weren't you able to control yourself?
>
> THE DEFENDANT: Well, I didn't realize what was building up inside of me. I wasn't angry with the baby. I had been through a lot all week with the baby, the crying and still trying to work and keep her and develop a relationship with us and still trying to do some of my housework at the same time.
>
> I wasn't aware of what the crying was doing to me.
>
> THE COURT: Of the crying?
>
> THE DEFENDANT: The crying, yes.
>
> I guess what I am trying to say is I guess it was building up. Something was building up inside of me and I wasn't aware of it to make me lose control. This is what I'm saying.

Appellant's asserted "loss of control" was not inconsistent with the subjective awareness the judge found she was admitting.[3] I therefore am satisfied that her plea was voluntary and intelligent within the framework of *Henderson* and *McClurkin,* and

---

**3.** The trial judge agreed with appellant's counsel's analysis at sentencing that appellant's "admissions at the time of her plea included an understandable propensity towards 'avoidance' of acknowledging the full import of what she had done."

that the motion to withdraw her plea was properly denied.