Kevin A. WHITE, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CF–1593.

District of Columbia Court of Appeals.

Argued March 20, 1996.
Decided April 24, 1997.

---

9. We have no occasion to express a view on the effect of adding the *Crowder* language to the

*Winters* charge.

M.L. Armstrong, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Anjali Chaturvedi, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Ronald Walutes, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB, Associate Judge, and PRYOR, Senior Judge.

WAGNER, Chief Judge:

Appellant, Kevin White, a sixteen-year-old at the time of the offense in this case, was charged as an adult pursuant to D.C.Code § 16–2301(3) (1981), with second degree murder while armed (D.C.Code §§ 22–2403, – 3202 (1981)), possession of a firearm during a

crime of violence or dangerous offense (D.C.Code § 22–3204(b) (1981)) (PFCV), and carrying a pistol without a license (D.C.Code § 22–3204(a) (1981)) (CPWL). A jury returned a verdict of not guilty on the counts of second degree murder while armed and PFCV. The jury found White guilty of involuntary manslaughter, the lesser included offense of second degree murder, as well as CPWL.[1] The principal issue raised by this appeal is whether the trial court erred in declining to instruct the jury that the accused's age is a factor for consideration in determining culpability for involuntary manslaughter. We conclude that the error, if any, was harmless, and affirm.

## I. Factual Background

### A. The Government's Case

It was undisputed that White and Cedric Johnson, Jr. were friends. On the night of June 1, 1993, Johnson was visiting White at White's grandmother's home. About 12:15 a.m., on June 2, 1993, White was talking on the telephone with his girlfriend, Katrina Edwards, and Johnson's friend, Oprah Gadsen, in a three-way telephone call. Gadsen testified that during the conversation, she heard Johnson say, "get that gun away from me, get that gun out of my face." White told Johnson that the gun was not loaded, and Johnson repeated "get [the gun] out of my face." Gadsen then heard a click followed by a gunshot. After the gunshot, she overheard White call to his grandmother and tell her that he had shot Johnson. White returned to the telephone and told Edwards and Gadsen that he had to call an ambulance.

Later, White went to police headquarters with his mother where Sergeant Guy Middleton interviewed him. White told Middleton that he shot Johnson accidentally. He explained that he obtained the handgun from his brother and that he thought he had emptied all of the bullets; however, the weapon fell to the floor and discharged, striking Johnson in the eye and killing him.[2] White

---

1. White was sentenced under the Youth Rehabilitation Act, D.C.Code § 24–803(b) (1981) to concurrent prison terms not to exceed five years for involuntary manslaughter while armed and not to exceed 180 days for carrying a pistol without a license.

2. Officer Curtis, a ballistics expert, testified that the gun would not fire if dropped to the ground.

agreed to take the sergeant to the place where he had secreted the gun and bullets. Subsequently, a police technician, at Sergeant Middleton's request, went to the two locations. He recovered the gun and one bullet casing near 6316 Foot Street in Seat Pleasant, Maryland. He recovered three live rounds of ammunition at 5747 East Capitol Street.

White returned to the police station where he was questioned further. Sergeant Middleton characterized White's demeanor as "insincere" and unremorseful. White asked for his mother, and the sergeant terminated the interview.

### B. *White's Evidentiary Presentation*

White's brother, Donnell Petty, testified that he found the gun alongside his house at 5747 East Capitol Street, and he hid it under his sister's mattress. According to White, who testified on his own behalf, he discovered the gun while looking for money, which he usually kept under that mattress, and left it there. That afternoon, Johnson came to White's house between 4:00 p.m. or 4:30 p.m., and they went to play basketball. White confided to Johnson that he had found the gun. Later that evening, during the three-way telephone call, according to White, Johnson asked repeatedly to see the gun. White retrieved the gun, freed the cylinder, turned it upside down, and shook it in order to unload it. White said that he believed that the weapon was not loaded at that point. However, he admitted that he did not check to see whether all the bullets had been expelled because he thought that once turned upside down, the weapon would empty. White testified that while watching television, and apparently still talking on the telephone, he pulled the trigger and heard a clicking noise. He testified that he was not looking where the gun was pointed. When he pulled the trigger a second or third time, the weapon fired, striking Johnson.

White's grandmother, Lucille Nelson, and his aunt and uncle, who had been upstairs, came to see what had happened. White told his aunt and uncle that Johnson had been shot. Nelson observed Johnson lying in a "puddle of blood," and she said that White appeared to be scared and paced about before leaving the house.

White said that he called for an ambulance and took off his shirt to wrap Johnson's head. He told his family that Johnson had been shot accidentally. White said that he left the house in a panic and went to his mother's home, located at 6016 Martin Luther King Street in Seat Pleasant, Maryland, and he discarded the gun and ammunition along the way. When White reached his mother's home, he told her that he shot Johnson and asked her to take him to the hospital. White's mother went to the hospital, and when she returned, she accompanied White to police headquarters.

White admitted that he did not tell the truth initially because he was fearful. In addition to the version which White gave to the police about the gun discharging accidentally when he dropped it, he admitted telling his aunt and uncle that someone from outside had killed Johnson.

## II. *Jury Instructions*

During the court's discussion with counsel of proposed jury instructions, the government requested an instruction on involuntary manslaughter while armed, as a lesser offense of second degree murder while armed, based on a theory of criminal negligence, and the defense interposed no objection. The standard instruction, as given by the court, is reprinted in the margin.[3] However, defense

---

However, he also testified that the gun had a piece of metal that partially blocked a chamber in the cylinder, preventing one bullet from falling out with the rest of the bullets. Officer Curtis testified that only one trained in firearms would know to use the ejector button to insure that the chambers were empty, but one should also check visually.

3. In accordance with the standard criminal jury instruction, the court instructed as follows:

With regard to involuntary manslaughter while armed with a pistol, the essential elements of this offense each of which the government must prove to you beyond a reasonable doubt are, as follows:

1. that the defendant caused the death of the decedent;

2. that the conduct which caused the death was a gross deviation from a reasonable standard of care;

counsel requested a modification of the third element with the highlighted additions which follow:

> That the conduct which caused the death was a gross deviation from a reasonable standard of care, *or in other words, that Mr. White unreasonably failed to perceive the risk of harm to Mr. Johnson. In considering the reasonableness of Mr. White's actions, you may consider all of the circumstances surrounding those actions, including Mr. White's age.*

The government objected, and the trial court declined to instruct in accordance with the requested modification.

### III.

White argues that the trial court erred in failing to instruct the jury to consider his age as a factor in determining his criminal culpability for involuntary manslaughter. He contends that the standard of care enunciated in the second element for the offense is a gross negligence standard, which like its civil counterpart, requires consideration of the age of the accused in determining the standard of care to which the minor should conform. He argues that the minor accused can be held only to that standard of care which a youth of the same age, intelligence and experience would exercise under similar circumstances. The government argues that the applicable standard is an objective one and that the subjective characteristics of the accused are irrelevant in determining the standard of care for involuntary manslaughter. We consider first the general principles governing involuntary manslaughter in this jurisdiction.

Involuntary manslaughter, the offense for which White was convicted, is "the unintentional killing of another as a result of a noncriminal act which 'creates an extreme risk of death or serious bodily injury' or is a misdemeanor committed in such a way that is particularly dangerous to others." *Reed v. United States*, 584 A.2d 585, 588 (D.C.1990) (quoting *Comber/Haywood v. United States*, 584 A.2d 26, 47–48 (D.C.1990) (en banc)). The government proceeded in this case on the theory of criminal negligence. The element which separates involuntary manslaughter from second degree murder is the level of awareness of the actor of the risk involved in the reckless conduct which causes death. *Comber*, 584 A.2d at 49. "One who acts in conscious disregard of an extreme risk of death or serious bodily injury is guilty of murder, but if he or she is only unreasonably unaware of such a risk, the crime is involuntary manslaughter." *Id.* at 52; *United States v. Bradford*, 344 A.2d 208, 215 (D.C.1975). "The essence of involuntary manslaughter ... is the defendant's lack of awareness of the risk to others from his conduct when he should have been aware of the risk." *Reed*, 584 A.2d at 588 (citing *Comber*, 584 A.2d at 48–49).

White requested the trial court to submit for the jury's determination whether he "unreasonably failed to perceive the risk of harm to the decedent," considering in that connection "the surrounding circumstances, including his age." Although proposed as an explication of the second element of the involuntary manslaughter (*i.e.*, whether the conduct was a gross deviation from the standard of care), the requested instruction actually focuses on awareness of the risk. In the trial court, White did not take the position, which he does in this court, that minors should be held to a lesser standard of care by reason of their age as they are in cases

---

3. that the conduct which caused the death, created an extreme risk of death or serious bodily injury; and

4. that at the time of the conduct, the defendant was armed with a pistol.

The gist of the difference between second degree murder while armed with a pistol and involuntary manslaughter while armed with a pistol is in whether the defendant is aware of the risk.

To show guilt of second degree murder while armed with a pistol, the government must prove that the defendant was aware of the extreme risk of death or serious bodily injury.

For involuntary manslaughter, the government must prove, not that the defendant was aware of the risk, but that he should have been aware of it.

*See* Criminal Jury Instructions for the District of Columbia, No. 4.25 (second degree murder and criminal negligence involuntary manslaughter) and No. 4.03 (added armed element) (4th ed.1993).

involving civil negligence.[4] Therefore, we do not consider that aspect of his claim. The question which remains is whether it constituted reversible error for the trial court to fail to instruct the jury that it could consider White's age and the other circumstances in determining whether he should have been aware of the risk involved in his conduct.

We conclude that, even assuming error in this regard, the error was harmless.[5] *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). The critical factors to our determination are " 'the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.' " *Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980) (citing *Gaither v. United States,* 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969)). The issue affected by the claimed error was not central to the case. Although the government was required to prove that White should have been aware of the risk involved in his conduct, there was no evidence tending to show that White's age caused him to be unaware of the risk involved in pointing a gun at a person and pulling the trigger. The theory of the defense, as developed by the evidence, was not that White could not appreciate the risk of danger because of his age, but that he took every precaution to assure that the weapon was unloaded, and failed in that attempt because of a defect in the weapon.

The government's evidence was strong. A witness testified that she heard the decedent ask White more than once to keep the gun away from him and out of his face, and White persisted in spite of the warning. White admitted failing to look to see whether all of the bullets had fallen from the weapon after

he turned the gun upside down and allowed some of the bullets to fall out. He also admitted that he knew that guns cause death. There was also evidence of flight and concealment, and there were inconsistencies in White's version of the incident. On this record, we are satisfied "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248.

Moreover, White was not a child of tender years for whom age might be a significant factor. He was charged as an adult pursuant to D.C.Code § 16–2301(3). This section of the Code states that a person sixteen years of age or older is not considered a "child" when he has been charged by the United States Attorney with murder. White was charged with second degree murder while armed, possession of a firearm during a crime of violence or dangerous offense, and carrying a pistol without a license. For these charges, White could be prosecuted in the Criminal Division, thereby removing him from the definition of "child." This court has held that " 'once an individual who is sixteen years of age or older has been charged by the United States Attorney with a crime [under this statute], that individual shall be deemed transferred for criminal prosecution within the meaning of § 16–2307(h), with the resulting termination of Family Division jurisdiction.' " *In re M.R.,* 525 A.2d 614, 615 (D.C.1987) (quoting *In re C.S.,* 384 A.2d 407, 411 (D.C.1977)). If not a circumstance which makes age irrelevant, the fact that White was charged as an adult is one more factor which supports our conclusion that any error was harmless.

4. In civil negligence cases, a child is not held to the same standard of conduct as an adult, but rather "is required to exercise that degree of care which is ordinarily exercised, by children of like age, education, knowledge and experience." *See* STANDARD CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 5–7 (Revised ed.1985).

5. White claims that the asserted error should be reviewed under the constitutional harmless error standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We dis-

agree. The trial court instructed on all elements of the offense charged and the standard required for conviction. What White claims is that the trial court failed to explain some of the factors which could be considered in determining whether the required elements had been proven. The jury was not left without guidance on the elements. Therefore, we deem the *Kotteakos* harmless error standard to be appropriate. *See Jackson v. United States,* 645 A.2d 1099, 1102 (D.C.1994).

For the foregoing reasons, the judgment of conviction appealed from hereby is

*Affirmed.*